522 A.2d 522

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**John A. WITTMAACK.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1986.

Decided March 11, 1987.

610

612

Marshall E. Anders, Stroudsburg, Martin Comisky, Philadelphia, for respondent.

Edwin W. Frese, Jr., Ass't. Disciplinary Counsel, Harrisburg, for petitioner.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is a disciplinary case in which various charges of misconduct have been brought against a Pennsylvania attorney. Charge I concerns a real estate transaction in which Attorney Wittmaack failed to inform his clients, whom he represented in the matter of securing a construction mortgage, that he held a financial interest in and was counsel for a construction company which would receive the proceeds of the mortgage. Charge I also concerns Mr. Wittmaack's forgery of a document purporting to be signed by his clients in which the clients are said to acknowledge that Mr. Wittmaack represents both the purchaser and the contractor in the real estate transaction and that the clients consent to this dual representation. Charge II concerns another real estate transaction in which Mr. Wittmaack

represented both the buyers and the seller of real estate, but, until the closing was almost completed, failed to inform the buyers that he represented the seller.

The Hearing Committee which conducted evidentiary hearings in this matter submitted its Report and Recommendations on February 19, 1986, recommending a three month suspension. Both Petitioner (the Office of Disciplinary Counsel) and Respondent (Mr. Wittmaack) filed briefs on exceptions. On April 14, 1986 a panel of the Disciplinary Board heard oral argument, and on May 8, 1986, after the panel submitted its report to the entire Disciplinary Board of the Supreme Court of Pennsylvania, the Board unanimously recommended a two year suspension plus the payment of costs. This Court then issued a Rule to Show Cause why Mr. Wittmaack should not be disbarred. Because of the gravity of the offenses in this case, we view the penalties recommended by the lower tribunals as inadequate and hold that Mr. Wittmaack must be disbarred.

## CHARGE I: FACTUAL BACKGROUND

■ Although this Court conducts its review of attorney disciplinary cases *de novo* and is not bound by the findings of fact made by the lower tribunals, nevertheless, this Court will be guided by their findings with respect to matters of credibility of witnesses. *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 275, 472 A.2d 186, 188 (1983). After a review of the record, we are satisfied the facts in the case are substantially as the lower tribunals found them.[1]

Charge I concerns Mr. Wittmaack's representation of clients who were in the process of securing a construction mortgage to cover the cost of building a house on land which they purchased on October 3, 1980 in Blooming Grove Township, Pike County, Pennsylvania. In November of 1980, the buyers, Dr. and Mrs. John D. Nelson, of New York City, entered into a construction contract with Heck

---

1. The Hearing Committee made 50 findings of fact; the Disciplinary Board 9.

Builders for construction of a home on their lot in Pike County. Mr. Wittmaack had no involvement in this transaction and the Nelsons were represented by separate counsel when they selected Heck as their builder. One of the provisions of the construction contract was that the Nelsons, who made an initial payment of $2,500.00, could unilaterally cancel the contract and receive a full refund of their money.

In March of 1981 the Nelsons applied for and received a mortgage commitment. They inquired of a salesman for Heck Builders whether he could recommend a lawyer to represent them at closing, and he recommended Mr. Wittmaack. He did not tell them that Mr. Wittmaack was president, a director, and legal counsel for Heck Builders, nor did Mr. Wittmaack tell the Nelsons of his association with Heck Builders, although the Hearing Committee and the Disciplinary Board found that a third party had told the Nelsons of Mr. Wittmaack's connection with Heck Builders. Nor did Mr. Wittmaack tell the Nelsons that Heck Builders had failed to make a profit in its six years of existence, that Heck was owned by his father *and himself*, that the company owed the two of them $40,000 and that he had just loaned the company another $35,000. The closing was held in Mr. Wittmaack's office on May 24, 1981, at which time the Nelsons also executed a construction agreement with Heck Builders which, unlike the previous contract, could not unilaterally be cancelled.

Although construction on Nelsons' house began in August of 1981, in October 1981 the Nelsons were informed that Heck Builders would not be able to complete the contract because of financial difficulties. When Dr. Nelson phoned Mr. Wittmaack to ask for advice, Mr. Wittmaack suggested that he might use the services of one of the subcontractors or a new builder, but that in any event, he, Mr. Wittmaack would be unable to represent Dr. Nelson any further. Dr. Nelson then contacted another attorney from the same area who informed the Nelsons of Mr. Wittmaack's connection with Heck Builders and who repre-

sented the Nelsons in a civil action against Heck Builders, John Wittmaack and others associated with Heck Builders. Prior to filing the civil action, attorneys for the Nelsons confronted Mr. Wittmaack with the Nelsons' claim that he had not informed them of his interest in Heck Builders. Mr. Wittmaack denied this claim, insisted that the Nelsons knew of his interest, and asserted that he had in his possession a Multiple Representation Agreement (hereinafter M.R.A.) signed by the Nelsons which would establish that the Nelsons knew of Mr. Wittmaack's interest in Heck Builders and agreed to his representation anyway.[2] He was, however, unwilling to produce the original or a copy of this agreement.

Ultimately, Mr. Wittmaack did produce a photocopy, but not the original, of the Multiple Representation Agreement purportedly signed by the Nelsons, dated June 6, 1981. Mr. Wittmaack testified under oath in the civil proceedings brought by the Nelsons and also in the disciplinary proceedings that the Nelsons signed this document in his presence

---

**2.** The Multiple Representation Agreement, a document internal to Mr. Wittmaack's office, reads as follows:

MULTIPLE REPRESENTATION AGREEMENT

We the undersigned, hereby acknowledge that our attorney, John A. Wittmaack, Attorney at Law, has informed us that he represents the Purchaser and the Contractor in the course of this real estate transaction.

We consent to this multiple representation.

It is also understood that our attorney has disclosed that he is a principal, shareholder and director of William J. Heck Builders, Inc.

It is also understood that if a dispute arises between the parties represented herein, that the firm of John A. Wittmaack, Attorney at Law, shall terminate his representation with all parties involved and shall obtain new counsel for each respective party if they so desire.

In no such event, shall this be considered a waiver of liability of the firm of John A. Wittmaack, Attorney at Law, and no additional fees shall be due the firm of John A. Wittmaack, Attorney at Law, with the exception of actual disbursements made by his firm on behalf of the respective clients.

JOHN D. NELSON

LAUREL A. NELSON
DATED:
6/6/81

on June 6, 1981. Expert handwriting analysis, however, established that the signatures on this document were forgeries which were effected by xeroxing the Nelsons' signatures on the closing documents, pasting them on a copy of the M.R.A. and xeroxing the pasteup. Enlarged photographs of each signature establish conclusively that the signatures on the two documents have been forged by way of the process just mentioned. Further, the lower tribunals found, and we agree, that the closing was held May 24, 1981, not June 6, 1981. Mr. Wittmaack admits that he wrote the date 6/6/81 on the M.R.A. and he insists that the closing was actually conducted on that date. Dr. Nelson, a periodontist, testified that the closing occurred on May 24, 1981, and he produced office and medical records indicating that he was in New York City on June 6, 1981, treating patients.

As a result of Heck Builders' breach of the construction contract, the Nelsons were out-of-pocket $13,000, which they had paid to Heck and its subcontractors. However, in Nelsons' civil action against Heck Builders and Mr. Wittmaack, they received a $16,000 settlement, $15,000 of which was paid on behalf of Mr. Wittmaack.

## CHARGE II: FACTUAL BACKGROUND

In May of 1982, Mr. and Mrs. Lester G. Freundlich, of New York City, retained Mr. Wittmaack to represent them in the matter of their purchase of property in Pike County, Pennsylvania. Mr. Freundlich is an attorney practicing in New York. Pursuant to his representation of the Freundliches, Mr. Wittmaack secured a building and termite inspection of the property, and after the inspection report came in, acting on instructions from Mr. Freundlich, negotiated with the seller, one Mr. Dandrow, a reduction of price between $400 and $2,000 to cover the cost of certain repairs to the property. Mr. Wittmaack negotiated a reduction of $600. During a telephone conversation with Mr. Dandrow in which this price reduction was negotiated, Mr. Dandrow requested Mr. Wittmaack to represent him as well as the

Freundliches at the closing. Mr. Wittmaack agreed, but he did not inform the Freundliches of this dual representation until near the end of the closing when, without explanation, he handed Mr. Freundlich a Multiple Representation Agreement for his signature.

Although the Freundliches signed this agreement, Mr. Freundlich stated that he did so because "everything seemed satisfactory in terms of the deal" and there was "nothing to be gained by raising a stink." He also stated that he had no prior knowledge of Mr. Wittmaack's representation of both parties to the transaction, and that if he had been aware of the dual representation, he would have objected. He testified: "[I]f at any time I had been aware that he was representing the seller to any extent, I would very definitely have said: no way."

## CONCLUSIONS OF LAW OF THE
## DISCIPLINARY BOARD

### CHARGE I.

The Board concluded that Mr. Wittmaack violated the following Disciplinary Rules with respect to Charge I:

 A. DR 1–102(A)(3)—which prohibits an attorney from engaging in illegal conduct involving moral turpitude;

 B. DR 1–102(A)(4)—which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

 C. DR 1–102(A)(5)—which prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice;

 D. DR 1–102(A)(6)—which prohibits an attorney from engaging in conduct which adversely reflects on fitness to practice law;

 F. DR 5–101(A)—which prohibits an attorney from accepting employment if the exercise of his professional judgment on behalf of his prospective client will be or reasonably may be affected by his own financial,

business, property or personal interests unless the client consents after full disclosure.

G. DR 5–104(A)—which prohibits an attorney from entering into a business transaction with a client if they have differing interests and if the client expects the attorney to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure;

H. DR 5–105(A)—which provides that an attorney shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C);

I. DR 5–105(C)—which provides that in situations covered by DR 5–105(A), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each;

J. DR 6–102(A)—which prohibits an attorney from attempting to exonerate himself from or limit his liability to his client for his personal malpractice;

## CHARGE II.

With respect to charges arising from the Freundlich representation, the Disciplinary Board determined that Mr. Wittmaack violated the following Disciplinary Rules:

A. DR 1–102(A)(6), which prohibits an attorney from engaging in conduct which adversely reflects on fitness to practice law;

B. DR 5–105(A), which provides that an attorney shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by

the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C);

C. DR 5–105(C), which provides that in situations covered by DR 5–105(A), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

## LEGAL ISSUES

A summary of Mr. Wittmaack's position is that he informed the Nelsons of his involvement with Heck Builders and that he also informed Mr. Freundlich, prior to the closing, of his representation of Mr. Dandrow, the seller in the Freundlich real estate transaction. Further, Mr. Wittmaack asserts that he did not forge the M.R.A. purportedly signed by the Nelsons and that he did not perjure himself in his testimony that the Nelsons signed the M.R.A. in his presence on June 6, 1981. In sum, Mr. Wittmaack denies any wrongdoing.

Additionally, Mr. Wittmaack raises a number of legal challenges to the proceedings below. The first legal issue raised by Mr. Wittmaack is whether in a disbarment proceeding the applicable standard of proof should be more stringent than the currently applicable preponderance of evidence. Mr. Wittmaack claims that because there is a great deal of difference between the sanctions of suspension and disbarment, *See Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 578–79, 506 A.2d 872, 874–75 (1986), the standard of proof in a disbarment proceeding should be higher than in a suspension hearing. Mr. Wittmaack also asserts that the effect of disbarment on an attorney is criminal in nature and that proof of misconduct should be required to meet the criminal standard: proof beyond a reasonable doubt. While it is plain that disbarment is a

sanction of the most serious dimension, and in fact, may be catastrophic for the errant lawyer, a disbarment proceeding, nevertheless, is a civil proceeding, not a criminal action, and we reaffirm our often stated standard of proof applicable in disbarment proceedings that the charged violations may be established by evidence which is clear and convincing. *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 579, 506 A.2d 872, 875 (1986).

Next Mr. Wittmaack contends that he should not be found to have violated Disciplinary Rules 5–101(A), 5–104(A), or 5–105(A) and (C) with respect to the Nelson representation because even if he did not disclose his business relationship with Heck Builders, the hearing committee found that the Nelsons knew of his relationship with Heck through a third party, and in any event, he was retained to represent the Nelsons only for a mortgage closing, not with respect to their involvement with Heck.

■ Disciplinary Rules 5–101(A), 5–104(A), and 5–105(A) and (C) are designed to promote an attorney's undivided loyalty and fidelity in representing the interests of his client. Every client has the right to expect that his attorney is his advocate, not his competitor, and not someone with a secret personal interest in the outcome of the client's case. Clients do not pay legal counsel for advice and representation which is or may be affected by counsel's own interests in the matter, and clients have a right to know not only whether an attorney has any interest in the subject matter of the representation, but also, if he has an interest, exactly what that interest is and how it may affect his judgment in their case.

■ Even if we assume in the present case that the Nelsons knew of Mr. Wittmaack's involvement in Heck Builders from a third party, Mr. Wittmaack did not disclose the full extent of his involvement, nor did he explain how that involvement might affect his judgment in their case.

Moreover, although Mr. Wittmaack was retained to represent the Nelsons at the closing, and not to locate a builder,

it would be myopic to overlook the fact that the mortgage proceeds were to be used to pay Heck Builders and that until the closing, the Nelsons could have rescinded their contract with Heck Builders and received a refund of their initial deposit in full. At the closing, however, the Nelsons executed a second contract with Heck Builders which was not able to be cancelled unilaterally, for the construction of a house. Moreover, at the closing, Mr. Wittmaack, an officer, director and legal counsel for Heck Builders, knew but did not disclose that Heck Builders had not made a profit in its six years of existence, that it owed Mr. Wittmaack and his father $40,000, and that Mr. Wittmaack had recently loaned the company an additional $35,000.

We agree with the Disciplinary Board that the Nelsons were entitled to rest assured that their attorney would not advise them to continue with a building project with a builder who the attorney knew to be unsound. At the very least, even if he did not believe that the builder was unsound, Mr. Wittmaack was obligated to inform the Nelsons of that possibility based on what he actually knew. His claim therefore, that he did not violate Disciplinary Rules 5–101(A), 5–104(A), and 5–105(A) and (C) is without merit.

Next, Mr. Wittmaack asserts that he violated no disciplinary rules in the Freundlich representation and that any possible violation "is at best a hyper-technical one which did not result in any loss and does not warrant even the imposition of suspension." Also, he argues that since the Freundliches signed the M.R.A., there was no violation and that the signed M.R.A. constitutes a waiver of any objection to the timing of the disclosure.

DR 5–105(A) and (C) require that an attorney shall not accept proffered employment which may adversely affect the attorney's independent professional judgment in behalf of a client or if it would involve him in representing differing interests unless (a) it is obvious that he can represent the interests of each adequately *and* (b) each consents after full disclosure of the possible effect of such

representation on the exercise of the attorney's independent judgment on behalf of each. The short answer to Mr. Wittmaack's claim is that it is not sufficient for an attorney to inform a client at the end of a transaction that the attorney represented the other party as well. And even if the timing were acceptable—which it is not—Mr. Wittmaack does not even claim that he ever explained to the Freundliches the effect of the dual representation on his independent judgment. DR 5–105(A) and (C) require both a prior notice and a full explanation. The proffering of a last-minute document without prior consent and with no explanation constitutes violation of the rule.

 Although Mr. Wittmaack asserts that he did inform Mr. Freundlich prior to the closing of his dual representation of the seller and buyer, and although he argues that there is no reason to believe Mr. Freundlich, the fact remains that the trier of fact did believe Mr. Freundlich. We too find Mr. Freundlich's testimony credible. Beyond that, we are troubled by Mr. Wittmaack's current insistence that any violation in the Freundlich matter was "hyper-technical." We do not view as "hyper-technical" the requirement that an attorney be scrupulously honest with his client concerning possible conflicts of interest. Moreover, contrary to Mr. Wittmaack's argument that the Freundliches have not been injured by any failure to disclose possible conflicts of interest, the Freundliches, the judicial system, the bar, and every citizen of Pennsylvania is injured when an attorney breaches his duty of strict loyalty and fidelity to his client. Contrary to being a trivial violation, Mr. Wittmaack's behavior undermines the very foundation of trust and confidence upon which the attorney-client relationship depends. This claim is without merit.[3]

Next Mr. Wittmaack asserts that the record does not support a conclusion that his testimony at the civil trial

**3.** That the Freundliches signed the Multiple Representation Agreement does not constitute a waiver of their complaint, but rather is merely evidence to be considered with respect to the substantive question of whether Mr. Wittmaack made the proper disclosures and secured the proper consent from his clients.

involving the Nelsons and in the disciplinary proceedings concerning the Nelsons' signing of the M.R.A. and the date of the Nelson closing was knowingly or intentionally incorrect in violation of DR 1–102(A)(3)–(6) and DR 6–102(A). The essence of this argument is that although there is physical evidence of forgery, there is no evidence as to who the forger was. Therefore, the argument goes, in the absence of direct evidence concerning the identity of the forger, Mr. Wittmaack cannot be found in violation of any disciplinary rules with respect to his testimony concerning the Nelson M.R.A.

Both lower tribunals found that Mr. Wittmaack testified falsely under oath that the Nelsons had signed the M.R.A. in his presence on June 6, 1981. Additionally, although the Hearing Committee found that he knew the document was a forgery, the Disciplinary Board made no finding with respect to his knowledge of the forgery.

The disciplinary rules involved in this charge are DR 1–102(A)(3), prohibiting illegal conduct involving moral turpitude; DR 1–102(A)(4), prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation; DR 1–102(A)(5) prohibiting conduct which is prejudicial to the administration of justice; DR 1–102(A)(6), prohibiting conduct that adversely reflects upon an attorney's fitness to practice law; and DR 6–102(A), prohibiting conduct designed to limit personal liability for malpractice. It is plain that if the evidence supports the findings that Mr. Wittmaack forged the M.R.A. and testified falsely concerning the M.R.A.'s validity and date of signing, his conduct falls within the scope of the above-stated rules.

Although there is no direct evidence that Mr. Wittmaack forged or directed the forgery of the M.R.A., there is circumstantial evidence that Mr. Wittmaack either forged the M.R.A. or caused it to be forged, and professional misconduct may be proven solely by circumstantial evidence. *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 579, 506 A.2d 872, 875 (1986), *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 198, 425 A.2d 730, 732

(1981). The circumstantial evidence in support of the finding is as follows:

1. No copy of the M.R.A. was forwarded to the Nelsons along with the other closing documents.

2. Mr. Wittmaack refused to produce the original or a copy of the purported M.R.A. upon demand by Nelsons' new counsel, although he stated that he had the M.R.A. in his possession.

3. The original of the M.R.A. was never produced, but a copy of a purported M.R.A. signed by the Nelsons was produced at the civil action initiated by the Nelsons.

4. The M.R.A. is a form document used by Mr. Wittmaack in his practice. The forged M.R.A. was submitted into evidence by Mr. Wittmaack himself, not by the Nelsons, and allegedly came from Mr. Wittmaack's files. It is reasonable to assume that only Mr. Wittmaack or persons working at his direction had access to these files.

5. Mr. Wittmaack testified that he had written the date 6/6/81 at the bottom of the forged document.

6. The forgery of this document would have benefitted only Mr. Wittmaack.

These circumstances constitute clear and convincing evidence that Mr. Wittmaack or someone working at his direction forged the M.R.A., that he did this in violation of the above-stated disciplinary rules, and that the reason for the forgery was to limit his liability in the action brought by the Nelsons.

██ Finally, Mr. Wittmaack argues that it was error to refuse to admit into evidence the results of a polygraph examination which Mr. Wittmaack had taken prior to the commencement of the disciplinary hearing. As we stated in *Commonwealth v. Gee*, 467 Pa. 123, 141, 354 A.2d 875, 883 (1976):

This Court has repeatedly and consistently held that the results of a polygraph examination are inadmissible for any purpose in Pennsylvania because the scientific reliability of such tests has not been sufficiently established.

Although we also indicated in *Gee* that we would be alert to new developments in the field of lie detection which would indicate that testing procedures have passed beyond the experimental stage into an area of objective trustworthiness, there is nothing on this record upon which to base such reconsideration. The claim, therefore, must be denied.

## SANCTIONS

■ Mr. Wittmaack's conduct may be summarized as two counts of failing to inform his clients of conflicting interests in matters wherein he represented the clients; failing also to explain to the clients the extent of his interests and the ways in which his independent judgment might be affected by these interests; fabricating a document designed to falsely exonerate himself from one of the conflict of interest problems, and lying about the fabrication of evidence at every stage of this and related proceedings, including the present stage.

In *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 425 A.2d 730 (1981), we stated:

> This court has held that false swearing is an "egregious species of dishonesty" which goes to the heart of the legal profession:
>
>> We are reminded of the comment of Daniel Webster: "Tell me. a man is dishonest, and I will answer he is no lawyer. He cannot be, because he is careless and reckless of justice; the law is not in his heart, is not the standard and rule of his conduct." ....
>
> In choosing an appropriate punishment, [there] is no doubt that dishonesty on the part of an attorney establishes his unfitness to continue practicing law. Truth is the cornerstone of the judicial system; a license to practice law requires allegiance and fidelity to truth. Respondent's false swearing and dishonest conduct are the antithesis of these requirements. We deem disbarment to be the appropriate remedy for false swearing.

*Id.*, 493 Pa. at 200, 425 A.2d at 733. We emphasize again today what we emphasized earlier in *Grigsby:* that truth is

the cornerstone of the judicial system, and the practice of law requires an allegiance and a fidelity to truth. Mr. Wittmaack's conduct, taken as a whole, establishes that his allegiance and fidelity has not been to truth; in fact, that he has engaged in duplicity, forgery and lies in support of the forgery, acts which are inconsistent with a license to practice law. Accordingly, Mr. Wittmaack is hereby disbarred from practicing law in the courts of Pennsylvania.

HUTCHINSON, J., files a dissenting opinion which is joined by LARSEN and ZAPPALA, JJ.

HUTCHINSON, Justice, dissenting.

I respectfully dissent. As the majority notes, the Disciplinary Board made no finding that respondent had forged his clients' signatures on the Multiple Representation Agreement. I do not believe the other charges warrant disbarment. I would therefore accept the Board's recommendation of a two-year suspension.

LARSEN and ZAPPALA, JJ., join this dissenting opinion.