# In re Anonymous No. 63 D.B. 85

Disciplinary Board Docket no. 63 D.B. 85.

BLOCK, *Chairperson, Special Hearing Committee,* February 9, 1988 —

## Statement of the Case

The Office of Disciplinary Counsel has charged [respondent] with violating Disciplinary Rules 1-102(A)(1) and (6) and 7-101(A)(5). In essence, the charges allege that respondent knowingly made false statements of fact in the representation of his client. The occasion which gave rise to these charges was respondent's testimony under threat of contempt at the recusal hearing of former Judge [A] in *[B] v. [C] Inc.,* no. [ ] May term, [ ] (C.C.P. [ ] County). Respondent testified that, in separate discussions with two [ ] Court of Common Pleas judges, those judges told him, in substance, that his client would not get a fair trial before Judge [A].

The hearing committee received testimony in this matter on June 17, July 1 and July 17, 1987. After careful review of the record, the hearing committee concludes that respondent did not violate the disciplinary rules. The petition for discipline is denied.

### Rulings on Admission of Evidence and Other Procedural Matters

Rulings on the admissibility of evidence and other procedural matters are set forth in a transcript of a

pretrial conference held *before the chairman on* June 4, 1987 and the transcript of the hearing. Further, with respect to respondent's exhibits R-5, R-6, R-7, R-8 and R-9, admission was granted following the close of testimony; counsel were informed by telephone.

## FINDINGS OF FACT

(1) Respondent was born in 1914 and was admitted to practice law in the Commonwealth of Pennsylvania in January 1938. His office is located at [ ].

(2) At all relevant times, respondent has been a shareholder in a law firm titled "[D]," now titled "[D]."

(3) In or about 1980, the [D] firm began representing defendants in a libel suit, *[B] v. [C] Inc.*, no. [ ], May term, [ ].

(4) The [B] suit was tried nonjury before former Judge [A] from April 19 through October 14, 1982, by respondent's partner, [E], Esq., and their associate [F], Esq.

(5) Plaintiff in the [B] suit was represented at trial by [G], Esq. and [H], Esq.

(6) Following the conclusion of testimony in the [B] suit, Judge [A] informed counsel that before rendering a verdict, he would review the trial transcript to determine whether receipt of evidence on punitive damages would be appropriate. If he made a finding that such evidence was appropriate, Judge [A] told counsel that he would conduct an evidentiary hearing on the plaintiff's right to punitive damages and defendants' financial net worth.

(7) Judge [A] also indicated that, following any further evidentiary hearing, he would give the parties an opportunity to file requests for findings of fact and conclusions of law, to submit supporting briefs and to argue orally before entry of a verdict.

(8) Judge [A] did not make any determination or conduct any hearing as described in paragraph 6 nor did he provide opportunity for submission of requests, briefs or arguments as described in paragraph 7.

(9) In March 1983 the [D] firm filed a motion on defendants' behalf for the disqualification and recusal of Judge [A].

(10) The motion was supported by an affidavit of defendant [I] and was based upon improprieties and appearances of impropriety in Judge [A's] conduct.

(11) Neither the motion nor the affidavit referred to respondent and the affidavit specifically excluded [I's] attorneys or members of the [D] firm as sources of information.

(12) By telephone instruction from Reno, Nevada, to his secretary, Judge [A] ordered a verdict dated May 6, 1983 against defendants and in favor of plaintiff in the amount of $7 million of which $2 million was described as compensatory and $5 million as punitive damages.

(13) From May 23 to July 13, 1983, Judge [A] held evidentiary hearings on defendants' motion for his disqualification.

(14) During the hearings, respondent was called as a witness, as on cross-examination, by plaintiff's counsel.

(15) Respondent moved to quash the subpoena issued by plaintiff's counsel for his appearance.

(16) Judge [A] denied the motion to quash.

(17) In the subpoena, plaintiff sought the production of various [D] firm records, none of which were the subject of questioning at the disqualification hearing.

(18) Rather, respondent was questioned repeatedly about the existence of information regarding the likelihood that defendants would not get a fair trial in the [B] suit.

(19) Respondent refused initially to answer the questions on the grounds of work product privilege.

(20) Respondent testified under threat of contempt and after the court's refusal to allow him an opportunity to take an immediate appeal.

(21) Respondent was asked the following question:

Q: [Respondent], how many people have stated to you directly that from the start of *[B] v. [C] Inc.*, the defendants would not get a fair trial?

He replied in the following manner:

A: At least two persons spoke to me directly without any other person in my office intervening. I am talking about those.

(22) Upon further questioning, respondent identified those two individuals as Judge [J] and Judge [K].

(23) Respondent was also asked the following question:

Q: [Respondent], has any individual, other than your client, stated to you that regardless of the merits, Judge [A] would ultimately award a large judgment against [L] and in favor of plaintiff?

He replied in the following manner:

A: Yes.

(24) Respondent, for the most part, was not permitted to explain his answers.

(25) Respondents' testimony was based on two conversations with Judge [J] which occurred during social contacts in or about April 1982 and June 1983.

(26) Respondent's testimony was also based on several conversations with Judge [K].

(27) Respondent testified, in several instances, that he could not recall the precise words used either by Judge [J] or by Judge [K] and that he could testify only to his understanding of what each judge was telling him.

(28) Respondent testified to the import and sub-

stance of the several independent conversations he had with Judge [J] and Judge [K].

(29) The [B] suit was newsworthy and had attained a substantial degree of notoriety.

(30) Judge [J] heard many lawyers express the opinion that "from the start of the [B] case defendant would not get a fair trial from Judge [A]."

(31) The first pertinent conversation between respondent and Judge [J] occurred at a private dinner party at Judge [J's] apartment. Judge [J] initiated a discussion of the [B] suit.

(32) In the course of that discussion, Judge [J] touched upon several items involving Judge [A], including the [M] case, a case where Judge [A] as a city solicitor failed to take an appeal which eventually cost the city several million dollars, and the fact that Judge [A] and [G] were in the city solicitor's office together.

(33) Judge [J] also raised the subject of the [B] case with respondent at a luncheon on June 5, 1983 and discussed some of the same topics they had discussed at the dinner party approximately one year earlier.

(34) Judge [J] testified that his conversations with respondent could reasonably be construed to mean that the defendants in [B] could not get a fair trial before Judge [A].

(35) Judge [K] and respondent had known each other for many years.

(36) During 1982 and 1983, Judge [K] and respondent met to have lunch together on several occasions.

(37) At these lunches, Judge [K] and respondent discussed law, politics, the legal profession and interesting cases in which each was involved.

(38) In 1982, Judge [K] also talked about the de-

teriorating image of the judiciary and explained it was one of the reasons he was considering leaving the bench.

(39) During these lunches, Judge [K] and respondent discussed the [B] case both during the pendency of the trial of the case in chief and the recusal hearing.

(40) During the pendency of the [B] suit, plaintiff's attorney [G] was also representing the plaintiff in *[N] v. [O]*, no. [ ], February term, [ ] (C.C.P., [ ] County) specifically listed for May 17, 1982 before Judge [K].

(41) A request was made for continuance of the [N] trial because [G] was on trial before Judge [A] in the [B] case. The request was in writing, dated May 13, 1982, to Judge [K].

(42) The [N] trial was continued to September 7, 1982.

(43) At [G's] request by letter dated August 30, 1982 and because of the [B] trial, the [N] trial was again continued.

(44) Ordinarily, Judge [K] investigated requests for continuance, particularly when a case was specially listed to begin on a day certain.

(45) During the [B] recusal hearing, Judge [A] sent a memorandum received by Judge [K] inquiring whether respondent's firm had filed other motions for recusal. Judge [K] called respondent to tell him about this.

(46) [G's] office also sought a continuance of a trial before Judge [K] because [G] was engaged in the recusal hearing before Judge [A]. Judge [K] called respondent at home to obtain information regarding how long [G] would be tied up with the recusal hearing.

(47) All the evidence points to the fact that Judge

[K] was aware of the [B] litigation both during the trial of the case in chief as well as the recusal hearing.

(48) Respondent's testimony at the disqualification hearing was that while he could not recall Judge [K's] specific words, the import of conversations the two had was that Judge [K] believed respondent's clients would not get a fair trial before Judge [A].

(49) Petitioner did not present any evidence which would show that third parties were privy to the conversations between Judge [J] and respondent or to the conversations between Judge [K] and respondent.

(50) Respondent's testimony at the hearing before the disciplinary board was the same as that given at the recusal hearing.

(51) Respondent has an excellent reputation for truthfulness as testified to by members of the local bar, the national bar and the judiciary.

(52) Respondent's testimony during the recusal hearing and before this committee was truthful.

## DISCUSSION

The Office of Disciplinary Counsel has charged respondent with violation of the following Disciplinary Rules of the Code of Professional Responsibility:

(1) D.R. 1-102(A)(4) which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

(2) D.R. 1-102(A)(6) which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law; and

(3) D.R. 7-102(A)(5) which prohibits an attorney during his representation of a client from knowingly making a false statement of law or fact.

These charges arise out of respondent's testimony at a hearing to determine whether former Judge [A] should recuse himself from presiding over a case

entitled *[B] v. [C] Inc.,* no. [ ], May term [ ] (C.C.P., [ ] County). The motion for disqualification and recusal was filed on behalf of defendants in the case. Defendants were represented by members of respondent's law firm. Although not involved in the case, respondent was subpoenaed to testify at the recusal hearing over which Judge [A] presided. From this proceeding petitioner accused respondent of testifying falsely under oath at that hearing. Having made such accusations, petitioner is required to prove its charges by clear and convincing evidence. *Office of Disciplinary Counsel v. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987).

Respondent's testimony involved the substance of separate conversations between respondent, Judge [K] and Judge [J] regarding the likelihood of his clients receiving a fair trial before Judge [A]. Judge [K] and Judge [J] deny making the statements attributed to them. However, both Judge [J] and Judge [K] admit to private conversations with respondent in which the [B] suit and/or matters touching upon Judge [A] and the plaintiff's attorney were raised.

Respondent's testimony before this hearing committee was reasonably consistent with the testimony he gave at the recusal hearing. On both occasions, respondent testified that the import of the independent conversations he had with Judge [K] and Judge [J] was that his clients would not receive a fair trial in the [B] suit. Although the precise words posed by the examiner may never have been uttered by either Judge [J] or Judge [K], a fact to which respondent repeatedly attested, it is clear to this hearing committee that a reasonable person could conclude that the impact or substance of Judge [K's] and Judge [J's] conversation with respondent were to that effect.

The character witnesses who testified on respon-

dent's behalf, lawyers and judges who are them-
selves outstanding members of the legal commu-
nity, spoke of respondent giving direct and honest
answers to questions, even where those answers
were not favorable to his position. At the recusal
hearing, once respondent was forced, under threat
of contempt, to testify, he did not engage in soph-
istry. We believe he answered truthfully or at-
tempted to do so as best he could under the circum-
stances. The committee is convinced that any
difficulty with respondent's answers given at the
recusal hearing is posed by the highly charged
nature of the recusal hearing, the nature and tone of
the questions and the obvious collaboration be-
tween plaintiff's counsel and the judge.*

---

\* Examples of the colloquy at the hearing follow:

Q: [Respondent], would you tell me the number of people,
excluding your client, who told you directly that regardless of the
merits Judge [A] would ultimately award a large judgment against
the defendants and in favor of [G] and his client?

A: These were single conversations in which the —

[F]: Objection.

[G]: Your Honor —

[Respondent]: I have to answer this question?

The Court: I am overruling the objection.

[Respondent]: This is [I's] affidavit, not my affidavit. I am telling
you what was told to me, and what was told to me was that it was
general knowledge that we —

[H]: Objected to, Your Honor. . . .

Q: At any time either in person or on the telephone, when you saw
Judge [J] after that meeting in April 1982, at the dinner party, did he
ever repeat to you that regardless of the merits Judge [A] was going
to award a huge verdict in favor of the plaintiff?

[F]: Objection.

The Court: Overruled.

Q: (By [H]) Yes or no, and then you can explain.

A: I can't answer that way. I have to tell you —

[H]: Your Honor, I think the question can be answered yes or no
with an explanation . . .

The Court: You can answer that yes or no, [respondent], and then

The record acquired by this committee reflects significant consistency between respondent's and Judge [J's] recollections of their conversations. Judge [J] also acknowledged that respondent's conclusions, given the circumstances, were correct. Judge [J's] testimony before this committee was:

"Having said that [discussing [M] with respondent] and with everything else that was going on with the courts, the backlog and all this other business, I can see where somebody could come to a conclusion that they thought that [A] couldn't give a fair trial from this

---

explain.

A: I don't recall that he used those precise words, but in substance he told me precisely the same import, that we could not get a fair trial because of the relationship between the judge and [G].

Q: How many times, number, give me a number, [respondent], did Judge [J] say to you, regardless of the merits, Judge [A] would find a huge award for the plaintiff, or words to that effect?

[F]: Objection.

The Court: Overruled.

A: I think I told you, I remember two occasions when the substance was, that because —

[H]: I just asked for a number.

The Court: He said two.

[H] That's the answer.

[Respondent]: I think I have a right —

[H]: May we get an admonishment that on redirect his counsel can inquire of him?

The Court: The question is how many times. You can answer the number of times —

[Respondent]: May I have the question read back?

[H]: It's been answered. May I ask the next question?

[Respondent]: I think I have a right to explain the answer in view of the nature of the question.

The Court: Read the question back.

[Respondent]: It's the words to that effect —

[H]: I'm addressing the court, [respondent]. The question asked for a number. My question has been answered . . .

The Court: It only requires a number. If you think that those words are significant on redirect you can address it. It just requires a number. The question is answered.

knowledge of Judge [A] because there were stories in the paper how [A] was acting peculiarly.

. . .

"Well, I think what I meant to say was with everything that was going on at that time about the courts, even from my conversation about the eminent domain case, about the backlog, and what other people and I think the conduct of Judge [A] is during the course of that trial, only from what I read in the paper how he acted, both a judge and witness, stuff like that, which I thought was very unusual, I can see where somebody could probably come to the conclusion he couldn't get a fair trial in front of him."

It is the committee's responsibility to judge the credibility of witnesses. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 275, 472 A.2d 186, 188 (1983). The committee has determined that Judge [K's] testimony regarding his knowledge of the [B] case during the pendency of that matter is not clear and convincing. Specifically, Judge [K's] failure to remember two requests by [G] for continuance of a specifically listed case, given Judge [K's] manner of investigating the need for continuance, because of the [B] trial, leads the committee to question the reliability of his testimony. Judge [K] testified that he personally would take a close look at circumstances if a request for continuance was made close to trial. This is what happened and the committee believes that Judge [K] twice acted on such a request. Given this testimony, along with the evidence that the [B] case was widely discussed in legal circles and reported in the media, the committee does not accept Judge [K's] recollections.

The committee finds respondent's testimony, based upon his own demeanor, the testimony of

character witnesses on his behalf, and the consistency of his testimony, to be credible. Respondent's assertion that his testimony in 1983 was truthful is supported by the evidence, if one examines, as the committee has, the context of respondent's communications with Judge [J] and Judge [K].

The petition for discipline is denied.

## CONCLUSIONS OF LAW

(1) The disciplinary board must prove its case by clear and convincing evidence. *Office of Disciplinary Counsel v. Wittmaack; supra, Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). (Evidence is sufficient to prove misconduct if a preponderance of that evidence establishes the charged violation and the proof is clear and satisfactory).

(2) To meet the burden of proof by clear and convincing evidence, the disciplinary board must present evidence that is so clear, direct, weighty and convincing as to enable the [fact finder] to come to a clear conviction without hesitancy of the truth of the precise facts in issue. *In re Adoption by Shives,* 363 Pa. Super. 225, 525 A.2d 801 (1987).

(3) The evidence presented by the witnesses for the disciplinary board to the effect that respondent testified falsely at the recusal hearing in the [B] lawsuit was not clear and convincing; in fact, the evidence, including testimonial evidence, did not even meet the lesser burden or proof by a mere preponderance of the evidence.

(4) Because we find that petitioner's evidence is not clear and convincing, we do not have to rule on the applicability of the two witness rule and we decline to do so. It is enough to say that Judge [J's] testimony was not made known to Judge [K], or vice versa.

(5) Judge [J's] testimony, in essence, corroborates respondent's testimony.

(6) Respondent did not engage in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of D.R. 1-102(A)(4).

(7) Respondent did not engage in any conduct that adversely reflects on his fitness to practice law in violation of D.R. 1-102(A)(6).

(8) Respondent did not knowingly make a false statement of fact in violation of D.R. 7-102(A)(5).

## RECOMMENDED DISPOSITION

It is our recommendation that the petition for discipline be denied.

## ORDER

HELWIG, *Chairman* —And now, March 10, 1988, the report and recommendation of the special hearing committee dated February 12, 1988, finding that no violation had been established and that the petition for discipline be dismissed is accepted; it is ordered and decreed, that the charges against [respondent] be dismissed.