## In re Anonymous No. 61 D.B. 95

Disciplinary Board Docket no. 61 D.B. 95.

SALTZ, *Vice-Chairman,* May 13, 1996—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court

with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

A petition for discipline was filed by Office of Disciplinary Counsel, petitioner, against respondent on April 28, 1995. Respondent filed a handwritten answer on May 24, 1995. A hearing on this matter was held on July 20, 1995, before Hearing Committee [     ] comprised of Chairperson [     ], Esquire, and Member [     ], Esquire. Member [     ], Esquire, was unable to attend the hearing; but the parties agreed that the hearing would go forth, and that [     ] would participate by reviewing the transcript of the hearing. Petitioner was represented by [     ], Esquire. Respondent did not attend the hearing and advised the Hearing Committee that he declined to exercise his rights to attend the hearing, to cross-examine witnesses, or to present evidence.

Following the hearing, petitioner filed a brief with the Hearing Committee and recommended a suspension of at least two to three years in length. Respondent filed a letter-brief in which he did not oppose petitioner's proposed findings of fact or the violations alleged. In addition, respondent agreed with petitioner's recommendation of a two- to three-year suspension. The Hearing Committee filed its report on January 16, 1996, and recommended a four-year suspension.

This matter was adjudicated by the Disciplinary Board at the meeting held on March 7, 1996..

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 400, Union Trust Building, Suite 3710, One Ox-

ford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) The respondent, [    ], was born March 19, 1960, and was admitted to practice law in the Commonwealth on November 15, 1985. His registered address is [    ]. He is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) Respondent is currently on inactive status and is not engaged in the practice of law. Respondent is employed full-time as a claims adjustor with [A] Insurance Company.

(4) The hearing on this matter was held, pursuant to notice, on July 20, 1995.

(5) Respondent had notice and actual knowledge of the hearing. Respondent, by fax communication to one member of the Hearing Committee and to the Office of Disciplinary Counsel, stated that he chose not to attend the hearing and thereby waived his right to present evidence, object to the introduction of evidence, cross-examine witnesses or to offer evidence in mitigation of the discipline, if any, to be imposed for any violations found to exist.

(6) Respondent further participated in the inquiry by executing two stipulations, which were admitted (with attachments) into evidence.

(7) On September 17, 1989, [B], and her daughter [C] (now [    ]), "the clients," were involved in an automobile accident in which [C] was the driver of a vehicle in which [B] was her passenger.

(8) The driver of the other vehicle was [D], who was insured by the [E] Insurance Company.

(9) On or about July 26, 1990, [B] and [C] spoke with [F], an insurance agent, about the accident. [F] referred them to the respondent, and provided them with a contingent fee agreement which each client signed.

(10) During the course of his representation of the clients, respondent never met personally with [B] or [C]. Most contacts [B] and [C] had regarding the case were with [F] or [G], a former employee of [F].

(11) On June 19, 1991, respondent filed a complaint on behalf of [B] and [C] in the [    ] County Court of Common Pleas to docket number [    ].

(12) On February 7, 1992, respondent called [H], attorney for [E] Insurance Company, and informed him that [B] was interested in settling the case.

(13) Also, on February 7, 1992, respondent wrote a letter to Attorney [H] stating that he had to withdraw from representation of [B] due to a change in employment. In this letter respondent informed [H] that [B] was interested in settling the case.

(14) On February 19, 1992, Attorney [H] wrote to inform respondent that [E] had authorized him to offer $12,000 to [B] and $4,800 to [C] in settlement.

(15) Between February 19 and 21, 1992, respondent spoke to [B] by telephone regarding the offer to settle. During this telephone conversation respondent presented Attorney [H's] offer to [B], but she rejected it.

(16) After speaking to respondent on or about February 19, 1992, [B] telephoned [C] and told her about the conversation with respondent. [B] told [C] that she had rejected the offer. [C] considered the offer satisfactory for her purposes, but decided she would not settle if her mother was not satisfied with her offer.

(17) Subsequently, respondent telephoned [C] and described the terms of the offer to her. Respondent told [C] that her mother ([B]) had agreed to the offer, which [C] knew was false. [C] informed respondent of this contradiction, and refused to accept the settlement. During this telephone conversation respondent made knowingly false representations to his client.

(18) On February 21, 1992, respondent wrote Attorney [H] stating that his clients had authorized him to accept the settlement offers. Respondent requested that Attorney [H] send him release forms so that the matter could be settled. This letter contained misrepresentations by respondent to opposing counsel which respondent knew were false.

(19) By letter dated March 4, 1992, respondent wrote a letter to Attorney [H] in which he stated that the releases "were signed by [B] and [C]," and enclosed two release forms bearing what was purported to be the signatures of [B] and [C]. Respondent had signed the releases as a witness to the clients' signatures. This letter contained misrepresentations by respondent to opposing counsel which respondent knew were false.

(20) Both [B] and [C] denied that they had signed the releases on March 3, 1992, or at any other time and in fact had never signed the releases. [B] and [C] never saw the releases until the releases were shown to them by an attorney they later consulted.

(21) A written report from [I], certified forensic document examiner, [J], was admitted into evidence and considered with full force and effect as though [I] had testified at the hearing to the facts and conclusions set forth in the report.

(22) [I] is qualified as an expert in the field of forensic document examination and handwriting analysis.

14

(23) The respondent, [   ], stipulated that he did not dispute or contest the findings and conclusions set forth in the report of [I], including her findings that:

(a) The handwriting on the release of March 3, 1992 is not the genuine handwriting of [B] and/or [C];

(b) The signatures on the release of March 3, 1992 bear 14 identifying characteristics found in the handwriting of the respondent, [   ]; and

(c) The examiner concluded to a reasonable degree of scientific certainty that the questioned signatures on the releases were "most probably by the same hand writer that wrote the six-page 'respondent's (answer to the petition for discipline).' "

(24) The respondent, [   ], handwrote the "respondent's answer to the petition for discipline."

(25) On the release purportedly signed by [C], her name is misspelled as "[   ]." Respondent used this same misspelling in letters written to Attorney [H] concerning the settlement and release.

(26) Respondent forged the signatures of [B] and [C] to the release dated March 3, 1992.

(27) On or about March 9, 1992, Attorney [H] wrote a letter to respondent enclosing two settlement checks. Check no. [   ] was made payable to [B] and respondent in the amount of $12,000. Check no. [   ] was made payable to [C] and respondent in the amount of $4,800.

(28) Respondent endorsed these checks and deposited them into his account no. [   ] at [K] Bank on March 10, 1992. This was a personal account in which respondent held his own funds as well as those of the clients.

(29) Respondent then wrote check no. [   ] payable to [B] in the amount of $8,000 and [C] check no. [   ] in the amount of $3,200, representing the amount received minus a fee of one-third, both drawn on respondent's personal bank account no. [   ] at [K] Bank.

These checks were paid from respondent's account on April 1, 1992.

(30) [C] attempted to call respondent at least 10 to 12 times over the next month to find out why they had received checks when they had not authorized a settlement, but she never reached the respondent or received a return call in response to messages she left.

(31) In June 1992, [B] and [C] decided to retain other counsel. Respondent turned over the files to [B] and [C] on June 9, 1992.

(32) In a letter accompanying the files, respondent advised [B] that the case against [D] had been settled. Respondent further represented that "Both you and [C] decided to take the offer rather than go to trial." The letter stated that the clients' rights to pursue an action against the insurance company for negotiating in bad faith were still intact despite the settlement. This letter contained misrepresentations made by the respondent to his clients which the respondent knew were false.

## III. CONCLUSIONS OF LAW

By his conduct, as set forth in the above findings of fact, respondent has violated the following Rules of Professional Conduct:

(1) R.P.C. 1.2(a)—A lawyer shall abide by a client's decisions concerning the objectives of representation.

(2) R.P.C. 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

(3) R.P.C. 4.1(a)—A lawyer shall not knowingly make a false statement of material fact or law to a third person.

(4) R.P.C. 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely

on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

(5) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

A review of the relevant case law reveals that respondent's conduct is most comparable in nature to the conduct of the respondents in those prior cases which resulted in a two- to three-year suspension. *In re Anonymous No. 49 D.B. 80,* 25 D.&C.3d 13 (1982), and *In re Anonymous No. 16 D.B. 85,* 43 D.&C.3d 293 (1987).

In both *In re Anonymous 49 D.B. 80* and *In re Anonymous No. 16 D.B. 85,* and the respondent's case, the lawyer forged his clients' documents in order to settle a matter the attorney was handling for his clients and made misrepresentations concerning the settlement. *In re Anonymous No. 49 D.B. 80* shares other similarities with respondent's case, in that the forgery occurred not for the attorney to misappropriate funds but in order to avoid continued litigation, but differs from respondent's case in that no commingling of funds occurred in *In re Anonymous No. 49 D.B. 80.* In that regard *In re Anonymous No. 16 D.B. 85* is more similar to respondent's case in that commingling did occur in that case. Yet, *In re Anonymous No. 16 D.B. 85* contains factors mitigating the level of discipline to be imposed, in the form of a seven-year delay in bringing the charges, which is not found in respondent's case.

While it appears that respondent's actions are similar to that of the attorney in *In re Anonymous No. 16 D.B. 85,* who received a two-year suspension from the practice of law, the culpability of the attorney in *In re*

*Anonymous No. 16 D.B. 85* was greater than the attorney in *In re Anonymous No. 49 D.B. 80,* who received a more severe discipline, a three-year suspension.

The case of *In re Anonymous No. 16 D.B. 85,* contained mitigating factors in the form of a seven-year delay in the bringing of charges which is not found in respondent's case in order to justify the lower level of discipline than that imposed in *In re Anonymous No. 49 D.B. 80.* The respondent's violations of the Rules of Conduct are more severe than those of the attorney in *In re Anonymous No. 49 D.B. 80.* Respondent has engaged in commingling, and the attorney in *In re Anonymous No. 49 D.B. 80* did not. Respondent's case has none of the factors present in it to mitigate the level of discipline as in the case of *In re Anonymous No. 16 D.B. 85.* A suspension from the practice of law for a period of three years should be the level of discipline to be imposed upon the respondent.

Disciplinary Counsel has submitted that if the Hearing Committee feels that the dishonesty evident in the respondent's forgery of the release rises to the level shown in *Office of Disciplinary Counsel v. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987), disbarment would be the appropriate level of discipline. While there exist many similarities between the *Wittmaack* case and respondent's case, the level of dishonesty exhibited by respondent cannot be considered tantamount to the level of dishonesty exhibited by *Wittmaack.* Respondent did not forge any document for submission into evidence himself from the charges brought against him, as did *Wittmaack.* Respondent's conduct merely evidenced a reluctance to admit his wrongdoing which he ultimately, for the most part, overcame. Respondent did not take any affirmative steps to create false evidence designed to mislead Disciplinary Counsel or this Hearing Com-

mittee as *Wittmaack* had done. The *Wittmaack* case only provides guidance by illustrating that as serious as respondent's violations have been they do not rise to the level where past cases have imposed disbarment as the appropriate discipline.

Likewise, respondent's case differs from those other forgery cases which have resulted in disbarment in that respondent did not employ forgery in order to misappropriate funds. See *Office of Disciplinary Counsel v. Kissel*, 497 Pa. 467, 442 A.2d 217 (1982); *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872 (1986).

The Office of Disciplinary Counsel "recommended a suspension of at least two to three years in length" unless the Hearing Committee believed that the dishonesty evident in the forgery of the release rises to the level shown in *Wittmaack* and then disbarment would be appropriate. The Hearing Committee concluded that the forgery did not rise to the level which would require disbarment. Respondent agreed "with the petitioner that a two- to three-year suspension would be consistent with prior case law" and joined in the recommendation that the Hearing Committee impose such a sanction. The Hearing Committee recommended a four-year suspension without explaining why a two- to three-year suspension would not be appropriate. Under the totality of these circumstances, it is believed by the Disciplinary Board that the appropriate sanction would be a three-year suspension since such a suspension is most consistent with the facts of this case, the concurring positions of Office of Disciplinary Counsel and petitioner, and precedent for similar cases.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, [   ],

shall be suspended from the practice of law for a period of three years.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Carson did not participate in the March 7, 1996 adjudication.

## ORDER

And now, July 1, 1996, upon consideration of the report and recommendations of the Disciplinary Board dated May 13, 1996, it is hereby ordered that [respondent], be and he is suspended from the bar of this Commonwealth for a period of three years, and he shall comply with all the provisions of Rule 217 Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.