# In re Anonymous No. 92 D.B. 86 and 59 D.B. 87

Disciplinary Board Docket nos. 92 D.B. 86 and 59 D.B. 87.

ECKELL, *Member,* March 2, 1989 —Pursuant to rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## HISTORY OF THE PROCEEDINGS

This matter arises out of two petitions for discipline filed by the Office of Disciplinary Counsel. The petitions concern five separate matters which shall hereinafter be referred to as [A], [B], [C], [D] and [E].

The first petition was filed on December 19, 1986 and related to respondent's representation of [A]. The second petition was filed on August 21, 1986 and contained four separate counts each relating to the [B], [C], [D] and [E] matters respectively. Respondent filed answers to both petitions, and the proceedings were consolidated.

On November 24, 1987 a hearing was held before Hearing Committee [ ] which addressed the following disciplinary rules which respondent allegedly had violated:

(A) D.R. 1-102(A)(4), conduct involving dishonesty, fraud, deceit or misrepresentation;

(B) D.R. 1-102(A)(5), conduct prejudicial to the administration of justice;

(C) D.R. 1-102(A)(6), conduct that adversely reflects on her fitness to practice law;

(D) D.R. 6-101(A)(3), neglecting a legal matter entrusted to her;

(E) D.R. 7-101(A)(1), intentionally failing to seek the lawful objectives of the client through reasonably available means;

(F) D.R. 7-101(A)(2), failing to carry out a contract of employment entered into with a client for professional services; and

(G) D.R. 7-101(A)(3), prejudicing or damaging the client in the course of a professional relationship.

Both parties filed briefs in which they basically agreed on the facts. The committee filed its report on October 11, 1988 and recommended that respondent be suspended for a period of two years, from November 24, 1987, the hearing date. The matter was adjudicated by the Disciplinary Board on January 27, 1989.

## FINDINGS OF FACT

The comprehensive findings of fact of the hearing committee are competently expressed and supported by the record. Accordingly, the board adopts those findings of fact as set forth herein.

### [A] Matter

(1) From November 1, 1984, until July 30, 1985, respondent was a staff attorney with the [ ] office of [F].

(2) On December 26, 1984, [A] was separated

from her husband, [G], and had physical custody of the couple's two children. [A] lived in [ ], Pa., and [G] lived in Texas.

(3) On December 26, 1984, [G] obtained physical custody of the children under false pretenses, removed them from Pennsylvania and returned with them to his home in Texas. That same day, counsel for [G] filed an "original petition" for divorce, child custody, support, division of property, and other relief in the District Court of [ ] County, Texas.

(4) On December 28, 1984, [A] met for the first time with respondent at the [ ] office of [F] and respondent conducted an interview with [A] on the custody problem. A "client retainer agreement" was executed between [A] and [F] naming respondent as [A's] counsel.

(5) Respondent discussed the custody problem with [A] again on December 31, 1984, and January 2 and January 3, 1985.

(6) In those interviews, respondent advised [A] that [F] would represent her in Pennsylvania custody proceedings. Respondent advised [A] that respondent would attempt to obtain representation for [A] in the Texas proceeding through Legal Services in Texas.

(7) Respondent drafted a petition for custody addressed to the Court of Common Pleas of [ ] County, Pa., and secured [A's] signature to the verification of that petition on January 2, 1985. However, the petition was never filed, and respondent never initiated any Pennsylvania custody proceedings on behalf of [A].

(8) On January 11, 1985, [A] received a copy of the "original petition" her husband had filed in the mail. The petition included a copy of a court order setting January 15, 1985 as the date for hearing on [G's] request for a temporary restraining order.

(9) [A] brought the papers she received to the attention of respondent at a meeting on January 11, 1985, and respondent told her not to worry, as respondent had spoken to Judge [H] and the matter would be taken care of in [ ] County.

(10) On January 14, 1985, respondent contacted [I], Texas counsel for [G], and requested a continuance of the hearing to allow [A] to retain Texas counsel. [I] agreed and confirmed this agreement in a letter dated January 14, 1985. The hearing was rescheduled for January 24, 1985.

(11) Respondent made one or two attempts to call a Legal Services office in Texas about representing [A], but never successfully arranged such representation or spoke to anyone in a position to do so.

(12) On January 15, 1985, [A] received another copy of the Texas petition, endorsed with a notice to appear at the hearing. [A] consulted with respondent again, and respondent told [A] that the papers had been filed in Pennsylvania and the matter was being taken care of. At the time, the only thing that respondent had done on this matter was to obtain a continuance of the hearing to January 24, 1985.

(13) Respondent advised [A] that [A] would have to travel to Texas to appear at the hearing, and that she would be represented there by lawyers from Texas Legal Services. On January 21, 1985, [A] borrowed money to buy airline tickets to Texas for the hearing. Respondent called [A] on January 21 and advised her that the hearing was being postponed to February 7 or 8, and that [A] would not have to attend the January 24 hearing. In reliance on this, [A] canceled her reservations and did not travel to Texas.

(14) A hearing on the request for a temporary restraining order was held in Texas on January 24, 1985, without appearance by [A] either in person or by counsel.

(15) [A] met with respondent on February 4, 1985, and was advised by respondent that the Texas hearing had again been continued to an unspecified date. Respondent also advised [A] on that day that [A's] petition had been filed in the Court of Common Pleas of [ ] County; that Judge [H] of the [ ] County Court was apprised of these events; that [G] was to be arrested in Texas or Oklahoma and extradited to Pennsylvania for a custody hearing; and that the children were to be picked up by a local social services agency in Texas and returned to Pennsylvania. None of this was true.

(16) On March 21, 1985, the Texas court, without further notice to either respondent or [A], entered judgment against [A] by default on several issues, including custody. [A] received notice of this judgment on April 2, 1985.

(17) [A] brought the judgment to respondent's attention on April 2, 1985. Respondent advised [A] that respondent had shown the default decree to Judge [H], that he was on top of the situation, and that the matter would be litigated in the Pennsylvania courts. These representations were not true. A second client retainer agreement between [A] and [F] was executed at this time. This agreement also named respondent as [A's] counsel.

(18) At some point in April 1985, respondent told [A] to appear at the [ ] County Courthouse on April 24, 1985, for a hearing on her Pennsylvania custody petition, which in fact had never been filed.

(19) [A] came to the [ ] County Courthouse prepared for a hearing on April 24, 1985. At that time, respondent met with her and told her that the judge's secretary had called to say that the hearing had been continued. Respondent told [A] to wait in the hall while she went into the judge's chambers.

(20) When respondent emerged from the judge's

chambers, she advised [A] that Judge [H] had given her custody because her husband had not appeared; that a hearing would be held with the approval of the appellate court; and that [G] would have federal charges lodged against him for not appearing. None of this was true.

(21) On May 28, 1985, respondent presented several verification statements for [A] to sign in blank without documents attached. [A] signed these statements.

(22) On June 3, 1985, respondent wrote to [G], [A's] husband, expressing [A's] interest in exercising her rights of temporary custody allowed her in the Texas decree.

(23) [G] then retained [J], Esq., as his Pennsylvania counsel for purposes of arranging temporary custody.

(24) Respondent discussed the custody arrangements with [J] and agreed to draft a stipulation by which [A] would recognize the jurisdiction of the Texas court and the validity of the Texas decree. Respondent drafted this stipulation, and then met with [A] and recommended she sign it. Respondent advised [A] that the stipulation did not mean anything as Judge [H] would set it aside when the children arrived. Although respondent was aware that [A] still considered the custody issue under litigation, respondent did not explain to [A] the possible legal effect of the recognition of the jurisdiction of the Texas court.

(25) Respondent told [J] in July 1985 that she had discussed the case with a [ ] County judge and had been informed that there was very little chance of establishing jurisdiction in Pennsylvania.

(26) On or about July 4, 1985, respondent told [A] that a warrant had been issued for the arrest of [G], that he would be arrested if authorities could catch

him before he left for Oklahoma, that the Oklahoma state police were attempting to arrest him in Duncan, Oklahoma, and that the children were to be picked up and brought to Pennsylvania. None of this was true.

(27) On or about July 8, 1985, respondent told [A] that the case had been scheduled for hearing in Texas before Judge [K]. Respondent further stated that there were Texas attorneys working on the case for [A]. None of this was true and Judge [K] was a fictional character invented by respondent.

(28) Respondent also told [A] that after this hearing, [A's] children were to be taken to the airport by a caseworker and the sheriff, and from there would be flown to Baltimore to be returned to [A]. None of this was true.

(29) Shortly after these conversations, respondent called [A] on the telephone and told her that the sheriff's car had been involved in an accident on the way to the airport, that the children were asleep in the following car and were not affected, but that they had missed their flight. None of this was true.

(30) On July 11, 1985, respondent asked [A] to sign additional verification statements with no documents attached, and [A] did so.

(31) [A] went to Texas on July 22, 1985, and returned with her children for temporary summer custody.

(32) Respondent led [A] to believe that respondent would file petitions in Pennsylvania to allow [A] to keep her children on a permanent basis after the temporary summer custody.

(33) On or about July 30, 1985, the management of [F] was informed for the first time of many of the events set forth in the above-numbered paragraphs. Respondent was immediately suspended from her employment at [F], and on August 2, 1985, she

resigned and temporarily discontinued her involvement in the practice of law.

(34) On August 1, 1985, [A], still thinking that legal action would be taken to keep her children in Pennsylvania prior to the time when they were to return to Texas, called [F] to inquire about what was happening. At this point, she was informed that there was a problem with her case and that another attorney would be handling it.

(35) [A] retained private counsel at that point. Days later, said counsel filed a complaint for custody containing a "petition for equity" in the Court of Common Pleas for [    ] County, seeking equitable relief to overturn the Texas decree and obtain jurisdiction over the matter in the Pennsylvania courts, based in part on the misconduct of [G] and in part upon respondent's failure to diligently represent [A].

(36) On October 15, 1985, after hearing, depositions, and briefing, the Court of Common Pleas of [    ] County entered an opinion and order finding that jurisdiction over the matter lay in Pennsylvania and awarding temporary custody to [A].

(37) After entry of the temporary order of October 15, 1985, primary custody was confirmed in [A] by an agreement signed by both parties and entered of record in both Texas and Pennsylvania.

(38) In the proceedings referred to in paragraphs 35, 36 and 37 herein, respondent cooperated with [A] and her counsel in an attempt to secure a favorable outcome for [A]. In the course of such cooperation, respondent gave a deposition in which she testified as to her current recollection of the case.

## [B] Matter

(39) Until September 10, 1984, [B] was employed at the [L] Company in [    ], Pa.

(40) On September 10, 1984, [B] was involuntarily terminated from his employment with [L] Company.

(41) [B] applied for unemployment compensation benefits. His application was denied by the [ ] Office of the Office of Employment Security on September 19, 1984.

(42) On September 27, 1984, [B] appealed the denial of his application, and on review, an unemployment compensation referee reversed the determination of the Office of Employment Security and awarded [B] benefits.

(43) [B's] employer appealed the referee's determination to the Unemployment Compensation Board of Review. On January 18, 1985, the Board of Review entered an adjudication reversing the referee's decision and denying benefits to [B]. Under the Pennsylvania Rules of Appellate Procedure, [B] had 30 days from the entry of said adjudication, or to February 17, 1985, to file a petition for review with the Commonwealth Court of Pennsylvania if he desired appellate review of the adjudication of the Unemployment Compensation Board of Review.

(44) On February 4, 1985, [B] contacted the [ ] Office of [F] and applied for legal assistance in filing a petition for review with the Commonwealth Court. He was found eligible for services and case file no. [ ] was opened in his name.

(45) [B's] case was assigned to respondent and a client retainer agreement retaining [F] and naming respondent as his counsel was executed on February 4, 1985.

(46) Respondent interviewed [B] on February 7 and February 15, 1985. On the latter occasion, respondent advised [B] that she would file a petition

for review on his behalf, and she obtained [B's] signature on a blank verification form without a petition attached.

(47) No petition on behalf of [B] was filed by February 17, 1985, or any time thereafter by respondent.

(48) On respondent's advice, [B] continued to report to the local Office of Employment Security. On June 18, 1985, the local caseworker advised [B] that there was no record of a petition for review having been filed on his behalf.

(49) [B] made an appointment with respondent for the following day, at which time respondent advised him that she had filed a petition for review, that she would give him a docket number for the petition as soon as she received it, and that the Bureau of Employment Security probably did not have a record of the petition because it took several weeks to show up on the computer.

(50) Approximately one week later, respondent called [B] and advised him to come to her office for information on the petition. When he arrived at her office, respondent informed him that a further hearing would be held and gave him a date for his alleged hearing.

(51) The day before the alleged hearing, respondent's secretary called [B] and told him that respondent could not attend the hearing due to a death in her family, and that the hearing would be rescheduled. This was false, as there had never been a hearing scheduled at all.

(52) [B] called again the next day, and respondent advised him that the Office of Employment Security had requested that he testify by deposition due to a backlog of hearings, and that she would therefore take his deposition. Respondent knew that there is no provision in the Pa.R.A.P. for the taking of depositions in connection with a petition for review of a

decision of the Unemployment Compensation Board of Review, and there had been no request for such deposition by the Office of Employment Security.

(53) On or before July 19, 1985, [B] met with respondent, at respondent's request, at her office, at which time respondent asked [B] questions in a tape-recorded "deposition." Respondent made an opening statement in [B's] presence that: "This is the deposition of [B] for the purposes of the appeal filed on behalf of [B] to the Commonwealth Court of Pennsylvania requesting that the court overrule the decision of the Unemployment Compensation Board of Review entered to decision no. [  ]."

(54) Respondent never informed [B] that she had failed to file his petition for review. [B] was first notified of that fact on September 26, 1985, when he received a letter to that effect from the Executive Director of [F].

(55) [B] has never claimed that respondent's conduct was the cause of his not receiving the several weeks of unemployment compensation benefits at issue.

## [C] Matter

(56) In January 1984, while employed by [M] at its [  ] office, respondent was consulted by [C] concerning her interest in obtaining visitation with her son.

(57) At the time set forth in paragraph 56 herein, respondent agreed to file a custody/visitation petition for [C], who paid to the [M] office a deposit of $40 for filing fees.

(58) Over the next several months respondent repeatedly assured [C] that her petition had been filed and that she would be receiving a court date soon.

(59) In fact, handling of said petition was referred to the program's [   ] Office as the matter had to be filed in [   ] County.

(60) Respondent's original representation of [C] terminated in the fall of 1984 when respondent left [M] and relocated to [   ], where she was employed by [F].

(61) Thereafter, [C] was represented by another member of the staff of [M], and a complaint was filed on her behalf. She was subsequently represented by different [M] and private attorneys.

(62) Respondent resigned her position with [F] in August 1985 and returned to [   ] County.

(63) On March 31, 1985, [C], through other counsel, filed a complaint for custody/partial custody/visitation, which was docketed to no. [   ], Court of Common Pleas for [   ] County. She was represented in that matter by [N], and [O], at various stages of that litigation, but as of December 1985 had no counsel in the matter.

(64) In December 1985, respondent opened a private practice in [   ] County. On December 6, 1985, [C] again retained respondent to represent her in her custody case and paid a fee of $100.

(65) Between December 1985 and April 1986, respondent, on several occasions, represented to [C] that respondent had filed a petition for hearing or had taken other steps to obtain resolution of [C's] case, and that respondent would have a court date soon.

(66) On several occasions in 1986, respondent advised [C] that respondent had court hearings set and had [C] bring witnesses to respondent's office, only to inform [C] that the hearing had been canceled. In fact, no hearings had ever been scheduled.

(67) At some point between April 7 and April 15, 1986, respondent gave [C] a copy of a court "order" granting her visitation with her son. The "order"

purported to bear the signature of Judge [P] of the Court of Common Pleas of [   ] County with the date April 7, 1986, typed on said "order." Respondent represented to [C] that Judge [P] had signed this order.

(68) Judge [P] held motions court on April 7, 1986, but respondent did not present the motion nor did she file any order for signature on that date.

(69) On April 15, 1986, [C] contacted an official of the court of common pleas about the "order" and learned that no such order had ever been entered.

(70) [C] questioned respondent about the "order," at which time respondent informed her that her secretary must have made a mistake in typing in the signature.

(71) Respondent wrote to [C] on April 23, 1986, and acknowledged no order had been entered. The "order" was falsified by respondent.

(72) Respondent filed a petition for hearing on May 9, 1986, and hearing was set for June 25, 1987.

(73) [C] retained other counsel to represent her at the June 25, 1987 hearing and thereafter.

(74) [Q], deputy court administrator for the Court of Common Pleas of [   ] County, called respondent's office six times to investigate the matter, but he did not receive a return call. He also wrote a memorandum summarizing his investigation to Judge [P] on April 17, 1986.

### [D] Matter

(75) In November 1986, respondent was representing [D] in the custody matter of *[D] v. [R]*, pending at no. [   ] in the Court of Common Pleas of [   ] County.

(76) Respondent told [D] that a hearing had been scheduled in his case sometime in November 1986.

By letter dated November 10, 1986, she had requested scheduling of a hearing, but none had been scheduled.

(77) On December 19, 1986, the [D's] drove to Pennsylvania to attend the hearing, but, when they arrived, respondent informed them that the other side had not appeared, and accordingly that the court was going to sign an order awarding custody to [D].

(78) When no order arrived by January 6, 1987, [D] contacted respondent, who told him that an order had been signed, but that the order was "snagged up in red tape" in the court. Respondent knew no order had been signed.

(79) About two weeks later, in mid-January, [D] called the court and spoke to [S], Esq., clerk of to Judge [T], demanding to know what was happening with the order that had been signed in his case. [S] checked the file and advised [D] that no hearing had been scheduled and no order was on record.

(80) [S] spoke to respondent about the matter, and respondent advised him that [D] was just mixed up and that she would take care of the problem.

(81) When [D] spoke to respondent about the matter, she admitted that she had misinformed him and that no hearing had been scheduled nor had any order been signed.

(82) [D] then obtained other counsel to represent him in the matter.

### [E] Matter

(83) On June 17, 1986, [U] filed a complaint to confirm custody against [E], which was docketed to no. [    ], Court of Common Pleas for the [    ] Judicial District, [    ] County Branch. By a rule to show cause issued upon presentation of the petition, hearing was set for July 13, 1986.

(84) [E] engaged respondent to represent him in the matter in June 1986.

(85) Respondent requested a continuance of a hearing scheduled in the matter on July 3, 1986, which the court granted to July 16, 1986. On July 16, the court, upon stipulation of counsel, entered an order which provided for a period of evaluation of [E] and his son by [   ] County Children and Youth Services, with no visitation being afforded [E] because of allegations of prior abuse of his son.

(86) [E] consulted with respondent several times during the months that followed and expressed his discontentment with the status quo under the court's order. Respondent advised him that she would take certain acts to alter that status quo, including filing a civil rights action in federal court and seeking to require Judge [T] to recuse himself from the case.

(87) In or about October 1986, respondent specifically advised [E] that she had filed a federal civil rights action on his behalf with the U.S. District Court in [   ], and subsequently reported to him various events and meetings with regard to this civil rights action. No such action was filed.

(88) In other telephone conversations and conferences following October 1986, the following took place:

(a) Respondent represented to [E] that Judge [T] of the U.S. District Court had ordered that [E's] son be examined by Dr. [V] of [   ]. On various occasions respondent gave [E] periodic reports on the progress of such examinations. No such examinations had been ordered or were taking place.

(b) Respondent represented to [E] that she had taken steps to have Judge [T] removed from the case and replaced with Judge [W] of [   ] County. Respondent had taken no such steps.

(c) Respondent represented to [E] that she had spoken to several individuals in [ ] County Children and Youth who felt that the finding of "indicated" abuse against [E] had been made improperly.

(89) On March 5, 1987, the case was scheduled for hearing on April 1, 1987.

(90) Respondent first advised [E] of this scheduled hearing date on the afternoon of March 31, 1987, when she called and left a message at his home in the late afternoon.

(91) When [E] called respondent in the evening of March 31, 1987, after just learning for the first time that the matter was scheduled for hearing, he advised respondent that he could not attend because he had business appointments the next day which he could not break. He further questioned the involvement of Judge [T], because he believed that Judge [T] would not be hearing the case as a result of respondent's efforts.

(92) On April 1, 1987, respondent appeared before Judge [T] and advised him, first in chambers and later on the record in open court that [E] had left a message on her answering service that he was having car trouble and did not know when he would arrive. This was false.

(93) In reliance upon respondent's statements, the court continued the matter until Monday, April 13, 1987 at 9:30 a.m.

(94) Respondent never contacted [E] to advise him of the events of April 1, 1987, or of the scheduling of the April 13 hearing.

(95) On April 10, 1987, [E] called [X] of the [ ] County Children and Youth Services and learned from her that there was a hearing scheduled the following Monday, as well as [X's] understanding of the circumstances of the continuance of the prior hearing.

(96) The April 13, 1987, hearing was scheduled for 9:30 a.m. At 8:00 a.m., respondent called the court administrator at his home and advised him that she was ill and would not attend the hearing.

(97) [E] called respondent at 10:30 a.m., at which time she advised him that she was withdrawing from the practice of law, and that his file would be turned over to [Y], Esq. Respondent further advised [E] in this conversation that she was having a nervous breakdown.

(98) Although respondent forwarded [E's] file directly to him on June 29, 1987, he has not obtained other counsel, and the matter remains in the same posture it was in when hearing was originally scheduled on March 5, 1987.

*Additional Findings of Fact — All Matters*

(99) In committing the various acts in the above findings of fact, respondent knew that what she was doing was wrong.

(100) It will be approximately one to two years from November 1987, before respondent may be ready to practice law again.

(101) Respondent will require an evaluation at the end of that time to determine whether she has the mental health necessary to practice law.

## DISCUSSION

The Disciplinary Board, after review of the record, affirms and adopts, in toto, the report of Hearing Committee [    ], with a modification of the committee's recommendation of a two-year retroactive suspension.

The hearing committee report sets forth the standard for determining whether or not respondent violated the disciplinary rules. Violations are proved

if established by a preponderance of clear and convincing evidence. *Office of Disciplinary Counsel v. John A. Wittmaack,* 513 Pa. 609, 522 A.2d 522 (1987); *Office of Disciplinary Counsel v. John J. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). The Disciplinary Board concurs in the committee's finding that the preponderance of clear and convincing evidence demonstrates that respondent violated the following disciplinary rules of the Code of Professional Conduct:

(1) D.R. 1-102(A)(3) - conduct involving dishonesty, fraud, deceit or misrepresentation ([A], [C], [D] and [E] matters).

(2) D.R. 1-102(A)(5), conduct that is prejudicial to the administration of justice ([A] and [E] matters).

(3) D.R. 1-102(A)(6), conduct that adversely reflects on fitness to practice law ([A], [B], [C], [D] and [E] matters).

(4) D.R. 6-101(A)(3), neglecting a legal matter entrusted to her ([A], [B], [C], [D] and [E] matters).

(5) D.R. 7-101(A)(1), intentionally failing to seek the lawful objectives of the client through reasonably available means ([A], [B], [C], [D] and [E] matters).

(6) D.R. 7-101(A)(2), failing to carry out a contract of employment entered into with a client for professional services ([A], [B], [C], [D] and [E] matters).

(7) D.R. 7-101(A)(3), prejudicing or damaging the client in the course of a professional relationship. ([A], [B], (prejudice only); [C], (prejudice only); and [E] (prejudice only) matters).

In determining whether respondent committed the aforesaid violations, the sole issue turned on respondent's state of mind during the period she engaged in the acts of misconduct. The standard in Pennsylvania for determining whether one has sufficient mental capacity to violate a disciplinary rule

is set forth in *In re Anonymous No. 38 D.B. 80,* 22 D.&C.3d 439 (1982). In that case, the disciplinary board stated:

"The fair preponderance of the evidence indicates that respondent, although then suffering from depression and some impairment of judgment and diminished capacity which occurred following the death of his wife, nonetheless knew that what he did hereunder was wrong, thus evidencing his having the necessary intent to violate said disciplinary rules. Accordingly, the board finds that respondent violated said disciplinary rules as indicated in its conclusions of law above."

Thus, if respondent was aware that her actions were wrong at the time they were committed, then the requisite element of intent exists and demonstrates violations of the disciplinary rules at issue.

In the instant case, respondent's misconduct took place between January 1984, when respondent agreed to represent [C], to April 13, 1987, when respondent informed [E] that she was withdrawing from the practice of law. Evidence was presented by three expert witnesses as to the state of respondent's mental health during this period of time.

In reviewing the expert testimony directed toward respondent's mental capacity, the board adopts the analysis of the hearing committee as follows:

"The deposition of [Z], M.D., was admitted into evidence as respondent's Exhibit 1. Dr. [Z] specializes in general adult psychiatry and is board-certified in this specialty. Following his examination of respondent, Dr. [Z] diagnosed respondent as suffering from 'adjustment disorder of adulthood,' from late 1983 through August 1985. While this term and another term, which we shall discuss later, are important, the crux of Dr. [Z's] testimony, as relevant, was brought out on his cross-examination.

"On cross examination, Dr. [Z] testified that during the entire period from early 1984 right through April 1987, respondent knew the difference between right and wrong. He further testified that it was well ingrained in respondent that it is wrong to lie and that she knew that it was inconsistent with her professional responsibility to lie to her clients about the status of their cases.

"[AA] is a doctor of philosophy. His degree is in clinical psychology and he has been in practice for 37 years exclusively in the clinical psychology field. He has been treating respondent and his diagnosis is that she suffers from a 'dependent personality disorder.' Dr. [AA] opined that the reason respondent made misrepresentations to her clients is because she made bad judgments because information was not processed properly by her when she was under stress. He testified that, in his opinion, at one point she did not know what she was doing and reacted as opposed to figuring out a proper response. However, he also testified that from 1984 through 1986 there were times when respondent may have known that she was doing the wrong thing, but did it anyhow.

"[BB] has an M.D. degree and specializes in psychiatry. He also completed a fellowship in forensic psychiatry. He agrees with Dr. [AA] that respondent suffers from a 'dependent personality disorder.' He testified that people with personality disorders do not have an impairment in their ability to know what they are doing. They are aware of their choices. However, because of their personality disorder, he stressed that they may not utilize the best judgment in choosing which, of the multitude of choices they may have, is the best one to make. Relating this to respondent, Dr. [BB's] opinion is that respondent was aware of what she was doing but was not

making the best judgments at the time. However, her personality disorder was not such as to overcome her awareness of right and wrong or her awareness that certain conduct is unacceptable, especially for a lawyer.

"Based on the testimony of the expert witnesses, we find that respondent, when committing the acts described in the findings of fact, knew what she was doing was wrong. Therefore, we conclude that she had the necessary intent to, and hence did, violate the disciplinary rules. *In re Anonymous No. 38 D.B. 80, supra.*"

Having fully concurred in the hearing committee's conclusions with respect to respondent's violations of the disciplinary rules, this board must now decide the appropriate measure of discipline.

First, we address respondent's request for probation. The qualifications for probation are provided for at 204 Pa. Code §89.291 as follows:

"(a) *Qualifications* — A respondent-attorney may be placed on probation if the respondent-attorney has demonstrated that he or she:

"(1) can perform legal services and the continued practice of law by the respondent-attorney will not cause the courts or profession to fall into disrepute;

"(2) is unlikely to harm the public during the period of rehabilitation and the necessary conditions of probation can be adequately supervised;

"(3) has a disability which is tempered or can respond to treatment and does not require transfer to inactive status; and

"(4) is not guilty of acts warranting disbarment."

Again this board agrees with the hearing committee's finding that respondent is not mentally capable of practicing law at this time. Respondent is suffering from a personality disorder. Allowing respondent to perform legal services could easily be detri-

mental to the public, at least until her doctors agree that she has the mental capacity to do so.

Furthermore, "[n]o attorney suspended for a period exceeding three months . . . may resume practice until reinstated by order of the Supreme Court after petition thereof . . . " Pa.R.D.E. 218. Thus, respondent has the burden of proving that she has the mental capacity to resume the practice of law before she can be allowed to practice. Probation, therefore, is inappropriate.

In determining what term of suspension would be proper, the hearing committee focused on the medical testimony of Dr. [Z] and Dr. [BB]. Dr. [Z] believes monitoring is required before respondent will be able to practice again but was vague on the prognosis. Dr. [AA] opined that respondent's prognosis is good, but he suggests that she refrain from practice for at least a year and that "[w]e take it just from there and we see what happens." Dr. [BB] does not suggest that someone who has a personality disorder would never be able to practice law, but believes that it will probably take a good year of therapy to begin to assess respondent's progress in order to determine if she can practice again. However, Dr. [BB] could not give the point from which the year would start.

Although respondent had a fine record prior to her misconduct which gave rise to these proceedings, she has been, and still is, suffering from a personality disorder. This board finds that a two-year suspension of respondent would serve to protect the public interest and the integrity of the bar. In *Office of Disciplinary Counsel v. John J. Keller, supra*, at 579, 506 A.2d at 875, the Supreme Court of Pennsylvania stated:

"The primary purpose of our system of lawyer discipline is to protect the public from unfit attor-

neys and to maintain the integrity of the legal system. See *In re Oxman,* 496 Pa. 534, 437 A.2d 1169 (1981), cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed. 2d 849 (1982); *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 579, 426 A.2d 1138 (1981): *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 425 A.2d 730 (1981)."

The Disciplinary Board is of the opinion that the hearing committee's recommendation of a two-year suspension applied retroactively should be modified. The hearing committee considered the order of the Supreme Court in *In re Anonymous Nos. 54 D.B. 83 and 59 D.B. 83,* 34 D.&C. 3d 606 (1985), a case very similar to the instant matter. The committee noted that in that case, the court imposed a two-year suspension. However, the suspension was not applied retroactively.

This board has determined that there are no compelling reasons to support the application of the two-year suspension retroactively. The record clearly demonstrates that respondent intentionally committed the aforementioned violations. Although her personality disorder is a mitigating factor, the evidence established that her offenses were deliberate.

Accordingly, the disciplinary board unanimously concludes that there is no basis for applying the recommended two-year suspension retroactively.

## RECOMMENDATION

For the foregoing reasons the Disciplinary Board recommends that respondent, [ ], be suspended from the practice of law for a period of two years. The board recommends further that, pursuant to rule 208(g), Pa.R.D.E., respondent be directed to pay the necessary expenses incurred in the investigation and prosecution of these proceedings.

Messrs. Schwartzman and Tumolo did not participate in the adjudication.

## ORDER

And now, March 31, 1989, upon consideration of the report and recommendations of the disciplinary board dated March 2, 1989, it is hereby ordered that [respondent] be and she is suspended from the bar of this commonwealth for a period of two years, and she shall comply with all the provisions of rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the disciplinary board pursuant to rule 208(g), Pa.R.D.E.