## Office of Disciplinary Counsel v. Heidecker

328

Disciplinary Board Docket nos. 22 D.B. 1999 and 48 D.B. 2000.

WATKINS, *Member,* January 28, 2003—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On February 26, 1999, Office of Disciplinary Counsel filed a petition for discipline against James L. Heidecker Jr., respondent in these proceedings. The petition charged respondent with violations of the Rules of Professional Conduct arising out of his alleged neglect of a client matter. Respondent filed an answer to petition on April 19, 1999, wherein he raised the issue of collateral estoppel.

A second petition for discipline was filed against respondent on November 10, 1999. This petition charged respondent with violations of the Rules of Professional Conduct based on allegations that he fabricated certain documents in connection with the above disciplinary proceeding docketed at no. 22 D.B. 1999. Respondent filed an answer to petition on May 16, 2000. The two petitions for discipline were consolidated by order of the Disciplinary Board dated May 17, 2000.

Respondent filed a motion to dismiss petition for discipline at no. 22 D.B. 1999 based on issues of collateral

estoppel and res judicata. Petitioner filed a motion to strike respondent's motion to dismiss. Respondent withdrew his motion to dismiss at the commencement of the disciplinary hearing on September 25, 2000.

Disciplinary hearings were held on the consolidated petitions on September 25 and 26, 2000, December 7 and 8, 2000, and January 18, 2001, before Hearing Committee 2.12 comprised of Chair Frank J. Toole Jr., Esquire, and Members J. Scott Maxwell, Esquire, and Douglas M. Johnson, Esquire. Petitioner presented the testimony of 11 witnesses and two expert witnesses. Petitioner offered into evidence a joint exhibit and a stipulation of facts, as well as numerous other exhibits. Respondent testified on his own behalf and presented the testimony of numerous witnesses and an expert witness, and he offered into evidence numerous exhibits.

Following briefing by the parties, the Hearing Committee filed a report and found that petitioner met its burden of proof as to the allegations in petition for discipline no. 22 D.B. 1999. The committee found that petitioner did not meet its burden as to the allegations in petition for discipline no. 48 D.B. 2000. The committee recommended that respondent be suspended for a period of six months as a result of his violations of Rules of Professional Conduct 1.3, 1.5(b), and 1.8(h).

Respondent and petitioner filed briefs on exceptions to the Hearing Committee report. Respondent also filed a brief opposing exceptions and requested oral argument before the Disciplinary Board.

Oral argument was held before a three-member panel of the Disciplinary Board on April 16, 2002. The panel was chaired by Marvin J. Rudnitsky, Esquire, sitting with

Members Richard W. Stewart, Esquire, and Louis N. Teti, Esquire.

This matter was adjudicated by the Disciplinary Board at the meeting of May 15, 2002.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, PA 15219, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent was born in 1947 and was admitted to the Pennsylvania bar in 1974. He maintains an office at 515 Linden Street, Allentown, Pennsylvania.

### No. 22 D.B. 1999

(3) In 1994 and 1995, respondent represented Felix Freytiz who was incarcerated, following his plea of guilty to possessing, with intent to sell, a large quantity of cocaine.

(4) Respondent was retained by Freytiz' wife to appeal Freytiz' conviction to the Superior Court. Ms. Freytiz paid respondent a retainer totaling $1,440.

(5) Respondent did not communicate to Freytiz, or his wife, in writing, as to the rate or basis of his fee.

(6) On October 28, 1994, respondent filed a notice of appeal with the Superior Court.

(7) In October 1994, respondent traveled to Reading to investigate records pertaining to the case.

(8) In November 1994, respondent met with Freytiz at the Camp Hill State Correctional Institution.

(9) Respondent failed to file a brief for the appeal with the Superior Court.

(10) By order dated March 30, 1995, the Superior Court dismissed the appeal for failure to file a brief.

(11) Respondent did not explain to his client that he believed the appeal was without merit and that a Post Conviction Relief Act petition should be filed instead.

(12) By letter dated June 22, 1995, Freytiz terminated respondent's representation.

(13) On or about July 23, 1995, respondent's secretary delivered the Freytiz file to William Freytiz, the brother of Felix Freytiz.

(14) Respondent's secretary, in exchange for the file, required William Freytiz to sign a preprinted form, on hand in respondent's office, purporting to relieve respondent from any and all liability in "Appeal from case no. 449/94 Berks County to Superior Court."

(15) The file release form indicated that a refund of the retainer would be forwarded within 30 days.

(16) No portion of the $1,440 retainer was refunded to Felix Freytiz.

*No. 48 D.B. 2000*

(17) By DB-7 letter, request for statement of respondent's position dated December 17, 1997, petitioner apprised respondent of a complaint filed by Freytiz charging respondent with professional misconduct.

(18) By letter dated February 8, 1998, respondent replied to the DB-7 letter denying the allegations.

(19) Respondent's counsel attached to the reply copies of four documents from respondent's file, as follows:

(a) Letter of October 21, 1994, to Luz Ramon (Freytiz), wife of Felix Freytiz (R-1).

(b) Bill dated October 21, 1994, addressed to Luz Ramon (R-1).

(c) Letter of December 13, 1994, addressed to Freytiz (R-2).

(d) Letter of April 15, 1995, addressed to Freytiz (R-3).

(20) Both Freytiz and his wife denied receiving any of the documents.

(21) Petitioner undertook an investigation of records on file at the Lehigh County Courthouse to obtain copies of documents filed by respondent from 1994 to 1995.

(22) Petitioner retained the services of Peter Tytell, a forensic document examiner, who prepared a report dated August 6, 1999, finding that the reply documents (R-1, 2, 3) submitted by respondent were not consistent with the typeface or font of the documents of the sampling retrieved from the courthouse.

(23) Having been provided with a copy of the Tytell report, respondent submitted to petitioner copies of 14 additional letters from respondent's files.

(24) The typestyle of the 14 letters is consistent with the typestyle of the reply documents, and the letters are dated within the same time period.

(25) Petitioner then investigated the documents in the second submission by obtaining additional court filings and by contacting the addressees of those letters and

opposing counsel in the cases referred to in the documents.

(26) On November 18, 1997, petitioner sent a second DB-7 letter to respondent alleging that respondent fabricated a letter to James J. Narlesky, Esquire, as well as the first reply letters.

(27) A second petition for discipline was filed on April 20, 2000, charging that respondent fabricated documents and submitted them to the Disciplinary Board.

(28) On May 12, 2000, respondent submitted to petitioner 10 additional documents.

(29) As part of its investigation of the documents in the third submission, petitioner contacted the addressees of those letters, all of whom delivered to petitioner documents appearing to be the original letters.

(30) The purported original documents received from the addressees were sent by petitioner to a forensic chemist and forensic document analyst, Erich J. Speckin, who used a process called "Relative ink age determination" to test the signatures on four of the documents submitted.

(31) Mr. Speckin concluded that the ink in the signatures on four letters was not completely dry as it should have been if the letters had actually been signed on the purported dates of those letters.

(32) Respondent's expert, Valery Aginsky, raised questions concerning Mr. Speckin's methodology and refuted Mr. Speckin's conclusion.

(33) The testimony of neither ink-dating expert was clear and convincing.

(34) Petitioner's document examiner, Peter Tytell, examined approximately 200 documents provided to him

by petitioner, which were produced by respondent's office during 1994 and 1995. All of the documents were generated by an Olivetti word processor and none contained the Times Bold typeface which is found in all of the documents submitted by respondent.

(35) During the time period from June 1994 to approximately June 1995, respondent's office had three word processing machines: two Olivetti word processors and a computer that was on loan during those months. (N.T. 1088-1091.)

(36) During 1994 and 1995, respondent purchased letterhead from several sources, including local stationery providers and SDE Printing in Buffalo, New York. (N.T. 828-830, 933-935.)

(37) In 1995, the Allentown area code was changed from 215 to 610.

(38) During 1994, either area code could be used.

(39) During 1994, respondent's office used letterhead with both the 215 and 610 area codes on the letterhead.

(40) Letterhead from the different suppliers and containing different area codes was stored at each typing station in respondent's office. (N.T. 1116, 1118.)

(41) During 1994 and 1995, respondent employed two secretaries: Kathy Palmer, who worked full-time for respondent and is currently employed in that capacity, and Debra Uff, who worked part-time, and who ceased her employment with respondent in 1996.

(42) During 1994 and 1995, respondent's secretaries primarily used the Olivetti word processors, in which legal and court forms and form letters were stored. (N.T. 1094-1110.)

(43) The loaned computer was used sparingly by the secretaries, as neither was fully accustomed to working on a computer. (N.T. 1088-1091.)

(44) Debra Uff used the computer on occasion to type letters when she had some free time in the office and the opportunity to practice on the computer. (N.T. 1091, 1095.)

(45) Debra Uff had no specific recollection of typing the reply letters marked R-1 and R-2, or the Narlesky letters, but the letters were in the format consistent with the machines used in respondent's office and were consistent with her "block" style of typing where the first word of each paragraph is not indented. (N.T. 1107.)

(46) Debra Uff performed approximately 95 percent of the typing duties in the office and sometimes brought work home to type on her Olivetti word processor. (N.T. 1110, 1164.)

(47) Sometimes Ms. Uff would work at Ms. Palmer's workstation and pick up tapes or other typing to finish work that had been started by Ms. Palmer. (N.T. 1116-1117.)

(48) If Ms. Uff was working by herself in the office, she had to interrupt her work to answer the telephone or handle other office business and would get sidetracked. (N.T. 1111.)

(49) James J. Narlesky, Esquire, received a letter from respondent dated January 31, 1995, the original of which has a typeface of Letter Gothic and an area code of 215, which are different than the letter provided by respondent to petitioner which has a typeface of Times Bold and a 610 area code letterhead.

(50) It is possible that two of the same letters were typed on different machines, resulting in the same letters having different typeface and letterhead. (N.T. 1110, 1111.)

(51) The board finds the testimony of Debra Uff to be credible.

(52) Five former clients of respondent turned over to petitioner's investigator documents from their files received by each of them, from respondent's office, on or about the dates shown on each document.

(53) These five clients testified at the hearing as to their receipt of the documents on or shortly after the date of each document and that the documents remained in their possession thereafter.

(54) The board finds these witnesses to be credible.

(55) The five former clients had no relationship with respondent other than a professional lawyer/client relationship.

(56) The documents produced by the five witnesses were all dated during 1994 and 1995 and the letterhead and typestyle of each document is consistent with the documents marked R-1, R-2 and R-3.

(57) Thirty-eight witnesses, including a retired federal judge, appeared and testified that respondent is viewed as a truthful and honest person in the community.

(58) Respondent has been the subject of prior disciplinary proceedings, as follows:

(a) Informal admonition on June 25, 1986.

(b) Private reprimand on April 5, 1990.

(c) Suspension for three months on July 19, 1997, with restitution directed to be made to respondent's former client.

(59) The three-month suspension was based on facts very similar to the charges contained in petition for discipline no. 22 D.B. 1999. Respondent was retained to appeal a criminal matter to the Superior Court. The client paid him a retainer of $2,500. Respondent failed to file the appeal, did not advise his client of this, and failed to return the retainer.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct as charged in petition for discipline at no. 22 D.B. 1999:

(1) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(2) R.P.C. 1.5(b)—When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation.

(3) R.P.C. 1.8(h)—A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement.

The board concludes that petitioner has failed to prove, by clear and satisfactory evidence, that respondent submitted fabricated documents to the Disciplinary Board as charged in petition for discipline at no. 48 D.B. 2000. Those charges against respondent are therefore dismissed.[1]

---

1. Seven members of the Disciplinary Board find that there is sufficient evidence that respondent fabricated documents and based on that finding would recommend that respondent be disbarred.

## IV. DISCUSSION

This matter is before the Disciplinary Board on two petitions for discipline. The first petition at no. 22 D.B. 1999 charges respondent with misconduct arising out of neglect of a client matter. The second petition at no. 24 D.B. 2000 charges respondent with fabricating letters to cover acts of professional misconduct. The board will initially discuss the misconduct central to the second petition.

The issue is whether respondent submitted fabricated documents to the Disciplinary Board. Respondent's client, Felix Freytiz, contended that he never received certain letters from respondent, which letters respondent submitted to petitioner in response to a DB-7 letter. This started petitioner's investigation into whether, in fact, respondent sent the letters as he purported. During this process, petitioner's investigators gathered scores of documents produced by respondent's office in the relevant 1994-1995 time period, in order to compare them with the documents submitted by respondent to petitioner in response to the DB-7 letter. The documents gathered by petitioner from the Lehigh County Courthouse were not consistent with respondent's submissions. The documents submitted by respondent had a typeface of Times Bold with letterhead containing a 610 area code. The sampling gathered by petitioner from the courthouse were on letterhead containing a 215 area code and a typeface other than Times Bold.

When confronted by these findings, respondent submitted additional documents, one of which was a file copy of a letter from respondent to Attorney James J. Narlesky, dated January 31, 1995. At petitioner's request,

Attorney Narlesky produced from his file the original letter of January 31, 1995, which was different in typeface and area code from the letter provided by respondent.

At the hearing, petitioner presented the testimony of a forensic document examiner who testified to the differences between petitioner's sampling and respondent's submissions. Petitioner also introduced the testimony of an ink-dating expert who testified that a number of the documents were signed at a later date than the purported date of the documents.

Respondent presented expert testimony of an ink-dating expert to refute petitioner's expert. Respondent's expert questioned the methodology used by the other expert.

After careful review of this expert testimony, the board does not find any of it to be persuasive. In essence, the board believes that the testimony cancels each other out and is not to be relied upon.

Respondent called six witnesses whose testimony was crucial to his case. Five of the witnesses were former clients of respondent. Elwood Marks, Frederick Aungst, Soissam Azar, William Shellhamer, and Delbert Kromer all traveled from the Lehigh Valley area to the Blue Bell Office of Disciplinary Counsel to testify for respondent. All five of the witnesses were sent bills or letters by respondent during the relevant time frame of 1994-1995. The documents were typed on a computer and were consistent in typestyle and letterhead with the reply documents sent to Felix Freytiz. Copies of these documents, along with others, were submitted by respondent to petitioner. Petitioner's investigator contacted these five witnesses and secured the original documents from them.

All five individuals testified that they received the documents from respondent on or shortly after the date of each document and that the documents remained in their possession since then.

Soissam Azar owns a towing business in the Allentown area and knows respondent in a professional, lawyer/client capacity. Respondent has represented Mr. Azar in civil matters on several occasions. Mr. Azar received from respondent a bill dated October 19, 1994 and a letter dated November 13, 1994. Mr. Azar maintained these documents in his home. In the summer of 2000, he was contacted by respondent, who asked if he still had the bill and letter. Mr. Azar gave the bill and letter directly to petitioner. These documents were in Mr. Azar's possession from 1994 until 2000. Mr. Azar had no contact with respondent but for the telephone call. Mr. Azar testified that he never saw respondent or gave him any documents.

William Shellhamer is a meat cutter from Allentown who has known respondent for eight years in a professional, lawyer/client capacity. Mr. Shellhamer received from respondent a letter of July 27, 1994, and a letter of March 22, 1995. Mr. Shellhamer kept these letters in his apartment. In the spring or summer of 2000, he was contacted by respondent, who asked if he still had the letters. Mr. Shellhamer found them and was told by respondent to keep them in his possession. Petitioner then collected the letters from Mr. Shellhamer. He testified that the letters never left his possession until he gave them to petitioner.

Mr. Marks, Mr. Aungst, and Mr. Kromer testified similarly. Petitioner was unable to shake this compelling testimony on cross-examination. All witnesses testified

credibly that they received the letters or bills at or about the date on the letters submitted by respondent to petitioner, and furthermore that such letters or bills never left their possession from the time they received them until they were given to petitioner. In order to find that respondent fabricated and submitted false documents, this board would have to find that these five witnesses concocted their stories and perjured themselves.

Among the documents submitted by respondent to petitioner was a file copy of a letter of January 31, 1995, to Attorney James J. Narlesky. The file copy and the original are different. While initially the letters appear to bolster petitioner's case against respondent, they can be explained in view of the testimony of Debra Uff regarding respondent's office procedures.

Ms. Uff was a part-time secretary for respondent during the time period of 1994 and 1995. She left respondent's employment in 1996 and currently works as a paralegal for an Allentown law firm. Ms. Uff performed approximately 95 percent of the typing duties in the office. Kathy Palmer, who is currently respondent's secretary, handled the other work. There were two Olivetti word processors and a computer in the office. Each secretary had an Olivetti at her workstation. The computer was on loan from a friend of respondent and was at a separate workstation. Ms. Uff did most of her work on the Olivetti as she was not accustomed to using the computer. Occasionally she would type documents on the computer to familiarize herself with it, as respondent wanted his secretaries to transition from word processors to computers. It was not uncommon for Ms. Uff to pick up work from Ms. Palmer's station and either finish typing it at Ms. Palmer's station or go back to her own

station or to the computer. Ms. Uff also brought work home with her at night because she had an Olivetti processor at home. Sometimes Ms. Uff was required to answer the telephone or do other office business when Ms. Palmer was not present, requiring Ms. Uff to interrupt her own work.

Each workstation had letterhead available for use. The letterhead for the office came from several different sources, including local stationers and a New York state supplier. Some of the letterhead had a 610 area code and some had a 215 area code. This is because in 1995 the area code changed from 215 to 610 in Allentown, and in 1994 either area code could be used. There was no office procedure as to when the different letterhead should be used.

Based on Ms. Uff's testimony, which the board finds credible, the reason for two different Narlesky letters can be explained by secretarial inadvertence and the less than efficient procedures utilized by respondent's office at that time.

Petitioner bears the burden of proving professional misconduct by evidence that is clear and satisfactory. *Office of Disciplinary Counsel v. Surrick,* 561 Pa. 167, 749 A.2d 441 (2000). In this case, petitioner has not met that burden in regard to petition for discipline no. 48 D.B. 2000. Petitioner did not prove that respondent fabricated documents.

The board must now consider the charges at petition for discipline no. 22 D.B. 1999. The board finds that petitioner did prove, by clear and satisfactory evidence, that respondent was retained by Mr. Freytiz to appeal his conviction to the Superior Court and failed to file a brief, resulting in dismissal of the appeal. Further, re-

spondent failed to document his fee arrangement with his client and required his client's representative to sign a receipt containing release language in exchange for the client's file upon termination of his representation. This release contained language that a refund would be forwarded to Mr. Freytiz, which refund was never forthcoming.

Respondent admitted many of the facts underlying the charges, including the fact that he should have filed a brief or withdrawn the appeal, after he became convinced upon investigation that the appeal was futile. He should not have made the unilateral decision to forego filing a brief. Respondent was retained specifically to appeal his client's conviction, a task that he failed to complete. Respondent failed to act diligently and professionally.

Respondent's failure to set forth his fee agreement in writing for his client resulted in clear misunderstanding for the client about what services would be charged against the retainer. Compounding this problem was the language in the release form, which stated that a refund would be forwarded in 30 days. Respondent's contention that he earned the retainer must fail in light of this evidence, and the board finds that the sum of $1,440 should be refunded to Mr. Freytiz.

Respondent's unprofessional actions deserve to be sanctioned. In mitigation, respondent presented many impressive character witnesses who testified that respondent is viewed as a truthful and honest person in his community. Nevertheless, this is respondent's fourth disciplinary proceeding. Respondent was previously suspended from practice for three months for very similar infractions of the Rules of Professional Conduct. In view of this prior record, and considering that respon-

dent's misconduct is nearly identical to that which resulted in a three-month suspension, the board is persuaded that a suspension of nine months is warranted. The board further recommends that respondent be ordered to refund $1,440 to Felix Freytiz.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, James L. Heidecker Jr., be suspended from the practice of law for a period of nine months, and that he be ordered to refund $1,440 to his client, Felix Freytiz.

It is further recommended that the expenses incurred in the investigation and prosecution of the petition for discipline at no. 22 D.B. 1999 are to be paid by the respondent.

Board members Cunningham, Stewart, Teti, Rudnitsky and Peck dissented from the majority as to the length of time respondent should be suspended and would recommend a one year and one day suspension.

Board members Rudnitsky, Scaricamazza, Peck, Teti, Stewart, Schultz and Curran dissented from the majority as to the findings and conclusions relating to petition for discipline no. 48 D.B. 2000 and would find respondent fabricated documents and based on that finding would recommend disbarment.

RUDNITSKY, *Member,* January 28, 2003—

## DISSENT OF MEMBER RUDNITSKY:

I dissent on two grounds. First, contrary to the board majority on 48 D.B. 2000, I would have found the petitioner's expert testimony to be compelling and consistent with other substantial evidence. Thus, the respondent engaged in a massive document fabrication to substantiate his false testimony, and I recommend disbarment. Second, while I join with the majority in finding yet another client neglect on 22 D.B. 2000, I recommend the sanction of suspension of law practice for a year and a day.

### No. 22 D.B. 1999

From 1986 to 1997, respondent engaged in a pattern of behavior where he accepted retainers in client matters, failed to proceed on them to the prejudice of his clients, and then misrepresented the facts to the client in an effort to cover up his neglects. In our disciplinary system, he has progressed from an informal admonition, to a private reprimand, to a three-month suspension, to bring him to the most recent client neglect. On these findings alone, the Hearing Committee recommended a six-month suspension and the board majority a nine-month suspension.

Reputation is what people say about you. Character is what you really are. In this case, the respondent has either failed to learn from the previous sanctions or is incapable of changing his behavior. Both the Hearing Committee and the board majority were impressed with the respondent's long list of character witnesses. Respect-

fully, I disagree that this mitigation is sufficient to remove this case from that sanction which requires him to demonstrate that he has the requisite character to practice law. His behavior over the years more clearly shows who he is than the reputation evidence he has put forth.

## No. 48 D.B. 2000

While defending himself in 22 D.B. 1999, respondent produced four letters and documents purporting to show that he communicated in writing to his clients that he felt that there were no grounds to support the appeal. These documents were successfully used by the respondent in defending himself in the civil case brought by the client against the respondent.

The three letters and one bill to the client were shown to the client and his wife. They said they had never seen them before. Office of Disciplinary Council hired Peter Tytell, a forensic document examiner, who prepared a report dated August 6, 1999, that concluded that the three letters and one bill were not consistent with the typeface and the telephone area code used on all of the other documents and paperwork in that client's case, nor were they consistent with the filings and documents used in other cases that respondent had in 1994 and 1995. The telephone area code had been changed from 215 to 610 by the telephone company and the paperwork submitted in this case contained the 610 area code and a typeface different than the typeface and area code used on the other paperwork in the client's case. A copy of this report was supplied by petitioner to the respondent in August 1999.

The next hearing was scheduled for October 28, 1999. Three days prior to that date, respondent supplied copies of 14 letters to petitioner to demonstrate that he was us-

ing the same typeface and the 610 area code on occasion in 1994 and 1995 in other matters. Petitioner commenced an investigation of these 14 letters by contacting the addressees to get possession of the original letters.

Only one original letter was able to be obtained. It was the letter to Attorney Narlesky. There were startling differences between the original letter and the purported copy offered by the respondent. The original letter was printed with a different type font and a different letterhead. It also had a different telephone area code. One could well ask why the investigator could not get originals from the clients of the respondent. Perhaps they discarded them. However, we noted with great interest the testimony of the respondent's secretary in this regard. She testified that she was contacting former clients of the respondent to announce the formal closing of their files. As a part of this process, she requested that the file in the possession of the clients be returned to her. In at least one case, the client faxed a copy of the file to the respondent's secretary and was told that the original file was needed. They gave it to the respondent's secretary, and never got it back. This is both an unprecedented and inexplicable way to close an office file. It is no wonder that this unusual factual background led petitioner to suspect that the respondent was inhibiting the investigation and tampering with evidence.

A new DB-7 was issued asserting that the respondent had fabricated the three letters and the bill used in the civil defense of the lawsuit of the Freytiz matter. The second petition also alleged the fabrication of the Narlesky letter. This DB-7 was issued on April 20, 2000. Six months later, the respondent provided petitioner with 10 more letters which purported to show that respondent

was using the same type font and area code in other cases through 1994 and 1995 as he provided in the three letters and one bill. In comparison to the 14 letters submitted earlier where only one original could be located, all of the originals were available this time. They were sent to a forensic chemist for analysis.

Eric J. Speckin, a chemist who has testified in both state and federal courts, examined the six letters and four bills comprising the 10 documents. The chemist concluded that only four letters had intact signatures. The others had signatures that had been intentionally erased. In our experience, recipients do not normally erase the signatures on original letters received by them.

The chemist used a relative ink age determination test. He testified that ink dries in three and a half years. Here, in the year 2000, he was looking at documents submitted by the respondent purporting to be from 1994 and 1995. Yet, he said, the ink was still not dry. They were not authentic letters, he concluded.

Counsel for petitioner called this case the most egregious use of dishonesty in the history of the disciplinary system. But, let's look at the respondent's case.

Ms. Uff and Ms. Palmer were the respondent's secretaries during the time period in question. They said the respondent's girlfriend loaned the office a computer for a little less than one year during 1994 and 1995 so that they could learn about computers. Occasionally, they would type a letter on it and it used the typeface or font not normally used in the office. This is the same typeface that petitioner showed the respondent didn't begin to use regularly until 1997 or 1998. And, they said, 1994-95 was the transition year of area code 215 to 610. They had stationery of both types on hand, they said. This might

explain why area code 610 was on the exculpatory letters and bill provided in 1999 to petitioner.

Finally, they said that they had more than one stationery supplier. This was important because all the watermarks of the exculpatory letters were different than the watermarks on the paper normally used in 1994-95. If this testimony were credible, this might supply sufficient answers to petitioner's allegations and concerns.

However, another curious piece of evidence was not explained away by the secretaries. Secretary Palmer said that the original letters would be signed by the respondent and a copy of that made for the file. In other words, the file copy would have a photocopy of the signature which appeared on the original. Yet, none of the 10 exculpatory letters provided in these proceedings as copies had a photocopy of the signature on them. Why?

The respondent had five witnesses to substantiate his claims. He presented five former clients who said that the letters in their files from 1994-95 were continuously in their possession, that they were the originals, and they were not out of their possession at any time. Further, they had the same typeface and area code as the four questioned documents questioned by Mr. Tytell and Mr. Speckin. In effect, they contradict the expert testimony of Mr. Speckin. We are faced with deciding if the expert is correct and these five witnesses are lying, or the expert is not correct. If the expert is correct, the respondent, his secretary, or someone else supplied these five witnesses with false letters without their knowledge, or with their knowledge and they lied about it. Perhaps their files had been "closed" by the unusual practice described earlier.

The respondent brought his expert from Russia. Valery Aginsky Ph.D., questioned the reliability of the ink-dating method used by Mr. Speckin. The Hearing Committee concluded that neither expert was convincing, stating that a Bachelor of Science degree is outweighed by Dr. Aginsky's doctoral degree. However, Dr. Aginsky performed no tests of his own. The respondent argued that he did not have enough time to do it. But, he had almost four months to do it. The ink-dating method was in use by the Secret Service and other government agencies. Mr. Speckin has testified about this method in 22 states and in Canada.

Dr. Aginsky testified that his own method of ink dating was more reliable and Mr. Speckin's was deemed unreliable by another expert in published articles. On cross-examination, however, it was brought out that the author of the critical article has since recanted his critical opinion.

The respondent brought forth 35 character witnesses, including a federal judge, prosecutors, former policemen, and lawyers. In a disbarment case, our Supreme Court has said that no amount of character evidence will overcome the fact that a respondent has lied to clients, the clients' security fund, and the courts. *Office of Disciplinary Counsel v. Passyn,* 537 Pa. 371, 644 A.2d 699 (1994).

Petitioner was not able to provide any rationale concerning the five witnesses. We are left to decide if there is clear and sufficient proof of this misconduct by respondent despite that testimony. The majority of this board was not convinced. Respectfully, I disagree with them. All doubt has not been removed because of those

five witnesses. While we may never know how respondent accomplished this particular misdeed, I remain convinced that it was done by him or at his direction. The evidence that remains is clear and sufficient for me to conclude that this respondent has fabricated the evidence in the case and should be disbarred. The indirect evidence of culpability is piled high. The respondent's misrepresentations in prior matters, the secretaries' purported "closing of files" by obtaining the return of originals from clients, the erasures of original signatures on the letters submitted by respondent, and the lack of photocopied signatures on the 10 letters being contrary to respondent's normal practice, cannot be disregarded. All of this is consistent with the petitioner's expert testimony, substantial, and clear and sufficient proof of his egregious misconduct warranting our most severe sanction.

Board members Stewart, Peck and Teti join in this dissent.

## ORDER

And now, June 26, 2003, upon consideration of the report and recommendations of the Disciplinary Board and dissenting opinion dated January 28, 2003, the petitions for review and responses thereto, the request for a briefing schedule and oral argument is denied and it is hereby ordered that James L. Heidecker Jr., be and he is suspended from the bar of this Commonwealth for a period of one year and one day, he shall comply with all the provisions of Rule 217, Pa.R.D.E., and he shall refund $1,440 to his client, Felix Freytiz. It is further ordered that respondent shall pay costs to the Disciplinary Board relating to the matter docketed at no. 22 D.B. 1999 pursuant to Rule 208(g), Pa.R.D.E.